[No. 7855. Decided February 24, 1909.]

THE TIMES PRINTING COMPANY, *Respondent*, v. THE STAR PUBLISHING COMPANY, *Appellant*, THE CITY OF SEATTLE *et al.*, *Defendants*.[1]

NEWSPAPERS—WHAT CONSTITUTES—CONTENTS. The noon edition of a newspaper, of eight pages, 18 inches by 23, issued regularly every day, containing telegraphic, sporting, political and theatrical news, advertisements and editorials, with an average daily circulation of over one thousand copies, sold on the street, without a subscription list at the time of submitting its bid, is a newspaper, in contemplation of our statutes relating to city printing.

EVIDENCE—JUDICIAL NOTICE—POPULATION.. The court will take judicial notice of the population of its cities as shown by a pamphlet issued under the auspices of the state, and of the approximate increase since the date of such issue.

NEWSPAPERS — WHAT CONSTITUTES — GENERAL CIRCULATION. A newspaper published in a city having a population of 275,000, having an average ·daily circulation of 1,000 copies, sold on the street, and a subscription list of 360, at the time of the acceptance of its bid, but with no circulation in the residence districts and rarely seen in business or professional offices, is not a newspaper of general circulation, within the meaning of charter provisions requiring city printing to be let to such papers; and the city is properly enjoined from entering into a contract for public printing awarded by the city council to such a paper (FULLERTON and CHADWICK, JJ., dissenting).

Appeal from a judgment of the superior court for King county, Kennan, J., entered October 13, 1908, upon findings in favor of the plaintiff, after a trial before the court without a jury, in an action to enjoin the letting of a contract for city printing. Affirmed.

[1]Reported in 99 Pac. 1040.

*Ballinger, Ronald, Battle & Tennant (C. J. France,* of counsel), for appellant.

*Bausman & Kelleher,* for respondent.

Gose, J.—This is an action brought by the respondent against the defendants and appellant to enjoin the defendants from entering into a contract with appellant to do the city printing of the city of Seattle for the year 1909. The city of Seattle, a city of the first class, is acting under an independent charter. The charter provides for the printing of all municipal legal notices, the manner of awarding contracts therefor, and for the designation of the city official newspaper. Section 31 of article 4, of the charter prescribes that such newspaper must be "A daily newspaper of general circulation and published in the city, to be styled city official newspaper." Such section further provides that the Board of Public Works shall, on the first Monday of August of each year, cause to be published a call for sealed proposals to do the city printing for the then next ensuing fiscal year.

In obedience to this provision, the board caused such notice to be published, and on August 10, 1908, the appellant filed its bid, in every way in compliance with the charter provision, proposing to publish in the Noon Star "all the city printing" for the next fiscal year. On August 29, all the bids, five in number, were opened, and the bid of the appellant, it being the lowest bidder, was accepted by the board.

On October 11th the case was tried to the court, which found that the Noon Star is only a preliminary or special edition of a newspaper called "The Seattle Star," and is not a newspaper on its own account, and enjoined the parties from entering into the contract. From this order this appeal is prosecuted.

Two principal points are urged: First, that the Noon Star is an edition of a newspaper, and not a newspaper proper; second, that it is not a newspaper of general circulation, within the meaning of the charter provision. We will

consider these points in the order stated.   The Noon Star is issued regularly every day, is an eight page paper, eighteen by twenty-three inches in size, with eight columns to the page, and contains telegraphic, sporting, political, and theatrical news and advertisements, and has an editorial column.   The Star Publishing Company published both the Seattle Star and the Noon Star.   Prior to June 20, 1908, the Noon Star was known as the Noon Edition of the Evening Star, and was principally devoted to sporting news.

The evidence shows that, at the time of filing its bid, the Noon Star had no regular subscription list, but that about one thousand papers were sold daily on the streets by newsboys.   At the time of the trial, it had a subscription list of 360, and an average daily circulation of 1,083.   In view of these facts, we do not regard it as important whether it was an edition of the Evening Star or an independent newspaper. Its size, the regularity of its issuance, and the variety of its news were such as to make it clear that it was a newspaper at the time it submitted its bid, and the fact that it contained news some of which was published the previous day in the Evening Star does not militate against this view.   This court, in the case of *Puget Sound Publishing Co. v. Times Printing Co.*, 33 Wash. 551, 74 Pac. 802, quoted with approval the following definition of a newspaper:

"A newspaper, in the popular acceptance of the word, is a publication issued at regular stated intervals, containing, among other things, the current news, or the news of the day.  21 Am. & Eng. Ency. Law (2d ed.), p. 533."

In *Hanscom v. Meyer*, 60 Neb. 68, 82 N. W. 114, 48 L. R. A. 409, the court say:

"The principal distinguishing feature of a newspaper, in contemplation of the statute, in our opinion, is that it be a publication appearing at a regular, or almost regular, intervals, at short periods of time, as daily or weekly, usually in sheet form, and containing news; that is, reports of happenings of recent occurrence of a varied character, such as

political, social, moral, religious, and other subjects of a, similar nature, local or foreign, intended for the information of the general reader."

In *United States Mortgage & Trust Co. v. Marquam*, 41 Ore. 391, 69 Pac. 37, 41, this language was used:

"Mr. Justice Mitchell, in *Hull v. King*, 38 Minn. 349, 350, 37 N. W. 792, in attempting to give a very general definition of a newspaper, says that according to the business world, and in ordinary understanding, it is 'a publication, usually, in sheet form, intended for general circulation, and published regularly at short intervals, containing intelligence of current events and news of general interest.' "

See, also, *Williams v. Colwell*, 18 Misc. Rep. 399, 43 N. Y. Supp. 720.

We next pass to the consideration of the second question, viz., was it a newspaper of general circulation at the time of the filing and acceptance of its bid? The evidence, as we have said, shows that about one thousand copies were daily sold on the streets by the newsboys, and that at the time of the acceptance of the bid it had no subscription list; that at the time of the trial, some two months later, it had a subscription list of 360 and an average daily circulation of 1,083. Furthermore, it appeared that, at the time of the acceptance of the bid, it had no circulation in the residence districts, and was rarely seen, either in business houses or the offices of professional men. In September, 1907, the city of Seattle had a population of 242,000 according to the "Review of the Resources and Industries of Washington," issued under the auspices of the state. At the time of the acceptance of the bid, it had a population of about 275,000. We think we may take judicial notice of this fact. The rule in respect to judicial notice is stated in 16 Cyc. 870 as follows: "The court will take judicial notice of the population of counties, cities, and towns, and of the approximate rate at which the population of such places increase." See, also, *Union Pac. R. Co. v. Montgomery*, 49 Neb. 429, 68 N. W. 619.

The controlling purpose of the city in letting a contract of this nature is to give the public notice of certain of its official and proposed official acts. Webster defines the word "general" as being equivalent to extensive. It is a relative term, and its meaning must be determined by a process of inclusion and exclusion. That which would be a general circulation in a town of 5,000 or 10,000 people can hardly be said to be general in a populous city. The appellant urges, however, that this question has been settled favorably to its contention in the case of *Puget Sound Publishing Co. v. Times Printing Co., supra.* We think the two cases are distinguishable. The former case was decided in 1903 when the population of Seattle was estimated at 121,813, according to the "Review of Resources," *supra.* At pages 555 and 556 the court, in discussing this question, uses the following language:

"The court further found, that The Bulletin circulates among all classes of people in the city of Seattle; that it has between 750 and 1000 subscribers in the city of Seattle, and is daily delivered to such subscribers, with the exception of legal holidays, and is daily read in the city of Seattle by about 3,000 persons; that it daily contains a resume of the world's telegraphic news, briefly stated; that it contains an editorial column devoted to the discussion of events and topics of interest to the general public; that it has been, by order of the superior court of King county, frequently designated as, and declared to be, a newspaper of general circulation; that for more than three years notices of all classes, required by law to be published in a newspaper of general circulation, have been published regularly in The Bulletin; among which appear summons for publication, foreclosure notices, all manner of probate notices required by law to be published, notices of foreclosure of delinquent tax certificates, and all other such notices as are usually found in a newspaper of general circulation; and that in each instance an order of the superior court of King county has declared The Daily Bulletin to be a newspaper of general circulation in King county. The testimony introduced at the trial, and the copies of the paper sent up as exhibits, seem to support the

findings of the court as to the character of The Daily Bulletin."

An examination of the language quoted will show the difference in the kind and extent of circulation. The Bulletin had a regular list of subscribers, and was read by 3,000 people. There is no evidence in the case at bar that the Noon Star was read by more than one thousand people. The circulation of the Bulletin was general among the people. The circulation of this paper is confined to those who buy it from the street. For more than three years the Bulletin had published all kinds of legal notices which the law required to be published. Our attention has not been called to the fact that any such publication has been made in the Noon Star.

In the case of *Norton v. Duluth*, 54 Minn. 281, 56 N. W. 80, also relied upon by the appellant, the statute defined the qualification of a newspaper for doing official printing as one regularly issued, published, and delivered to 240 paying subscribers. In the case of *Pentzel v. Squire*, 161 Ill. 346, 43 N. E. 1064, 52 Am. St. 373, cited in the appellant's brief, it was shown that the paper circulated among "lawyers and laymen," and had an average weekly circulation of 3,875. In *United States Mortgage & Trust Co. v. Marquam, supra,* at page 42 of the opinion, the court uses the following language: "The circulation of the Sunday Welcome through the mails, by delivery, and by news stands is from 1,000 to 1,100 copies, and is not confined to any particular class or sect of individuals." This case was decided in 1902. In *Williams v. Colwell, supra,* the court was considering the question as to whether the publication was in a newspaper within the meaning of the law, and at page 721 said: "And that it has a circulation in the city of Buffalo of 1,000, and in the county outside the city of 500, and in other parts of the state of New York and in twenty-four other states and the province of Ontario, Canada, of 3,600." Neither the Oregon statute nor the New York statute in direct terms

require a paper to have a general circulation. However, the courts in construing them assume that this is an implied qualification.

In view of the charter provision requiring that the paper selected shall be one of general circulation, the purpose of the publication of official notices, the population of the city of Seattle at the time of the acceptance of the proposal, and treating the word "general" as being equivalent in meaning with extensive, and giving to this word a reasonable interpretation, we are constrained to hold that the Noon Star was not a newspaper of general circulation at the time of the acceptance of its proposal to do the city printing. Indeed, we could not reach a different conclusion without unduly restricting the meaning of the word "general." This conclusion requires an affirmance of the judgment, and it is so ordered.

RUDKIN, C. J., DUNBAR, CROW, and MOUNT, JJ., concur.

FULLERTON, J. (dissenting)—I am unable to distinguish the question presented in this case from that presented and decided in the case of *Puget Sound Publishing Co. v. Times Printing Co.*, 33 Wash. 551, 74 Pac. 802, where we held "The Daily Bulletin" to be a paper of general circulation. In my opinion that case should be followed and not distinguished, and I dissent, therefore, from the judgment directed by the majority.

CHADWICK, J. (dissenting)—I cannot agree with that part of the majority opinion that assumes to hold that the Noon Star is not a newspaper of general circulation. It may or may not be so. In my judgment this is not a judicial question. It was determined by the city council of Seattle that it was a newspaper of general circulation. The determination of that fact having been reserved to the legislative body, its finding, in the absence of fraud, is conclusive upon the court. Otherwise no contract of the city within the limit

of its legislative power would be of any validity until revised or passed upon by the courts. I think the rule laid down in *State ex rel. News Pub. Co. v. Milligan*, 3 Wash. 144, 28 Pac. 369, is the true rule in this class of cases. In that case the city council of Tacoma had, under a charter provision declaring it to be the duty of the city council to designate the newspaper published by the party receiving the contract for city printing, let the contract to one who was in fact not the publisher of any newspaper—an extreme case—yet this court held:

"No principle of equity jurisprudence is better established than that courts of equity will not sit in review of proceedings of subordinate political or municipal tribunals, and that where matters are left to the discretion of such bodies the exercise of that discretion in good faith will not, in the absence of fraud, be disturbed. High on Injunctions (3d ed.) § 1240. In this case we think the council was acting within the scope of its lawful authority, so that the rule laid down by Mr. High in the next section, 1241, 'that the restrictions thus placed upon equitable interference with the action of municipal corporations do not extend to cases where the act sought to be enjoined is in excess of the corporate power,' has no application to this case. Possibly some inconvenience may on occasion arise by pursuing the policy adopted by the city council of Tacoma in this case; but to hold that the bidders must have the qualification of publishers would be to encourage a monopoly in the bidding business which might defeat the very object of the law and deprive the city of the benefit of competition, and make the requirement of bidding a mere farce. In this case we think the law authorizes the action of the city council, that they are acting within the limits of their discretion, and that the court therefore did not have jurisdiction of the subject-matter of the action, and that its action is therefore void."

The case of *Puget Sound Pub. Co. v. Times Printing Co.*, 33 Wash. 551, 74 Pac. 802, assumed to treat the question before us as a judicial question, without reference to the *Milligan* case. That case is, in my opinion, not only an unwarranted departure from, but is inconsistent with, the re-

peated holding of this court that it will not, in the absence of fraud, review the conclusion of a coordinate branch of the government, when it is the result of its discretion or entered upon a disputed state of facts. *Nichols v. School District,* 39 Wash. 137, 81 Pac. 325; *Parmeter v. Bourne,* 8 Wash. 45, 35 Pac. 586, 757; *Heffner v. Board of County Com'rs.,* 16 Wash. 273, 47 Pac. 430; *State ex rel. Reed v. Jones,* 6 Wash. 452, 34 Pac. 201, 23 L. R. A. 340.