GREAT SOUTHERN MEDIA, INC., AND B. E. FOWLER, PLAINTIFFS v. McDOWELL COUNTY, A BODY POLITIC AND CORPORATE; PAUL RICHARDSON, CHAIRMAN, McDOWELL COUNTY BOARD OF COMMISSIONERS; GUY L. HENSLEY, VICE CHAIRMAN, McDOWELL COUNTY BOARD OF COMMISSIONERS; GEORGE G. ELLIS; JANE GREENLEE; AND NED L. McGIMSEY, MEMBERS, McDOWELL COUNTY BOARD OF COMMISSIONERS; RONI HALL, McDOWELL COUNTY TAX COLLECTOR; AND JACK H. HARMON, COUNTY MANAGER, McDOWELL COUNTY; ALL INDIVIDUALLY AND IN THEIR OFFICIAL CAPACITIES; AND JAYVEE PUBLISHING COMPANY, A PARTNERSHIP, DEFENDANTS

No. 7

(Filed 1 December 1981)

1. **Notice § 2; Taxation § 39.2— notice of tax lien sales—choice of newspaper by tax collector—ratification by county commissioners**
   The decision to place tax lien sales notices in a specific newspaper was properly made by a county on the ground either that the county tax collector himself could make this decision or, if he could not, the decision was duly ratified by the county commissioners.

2. **Notice § 2; Taxation § 39.2— publication of notices of tax lien sales—general circulation requirements for newspaper**
   In order for a newspaper to qualify to publish notices of tax lien sales, it must meet the "general circulation" requirements of both G.S. 105-369(d) and G.S. 1-597, *i.e.*, it must be a newspaper of general circulation to actual paid subscribers in the taxing unit.

3. **Notice § 2; Taxation § 39.2— publishing notices of tax lien sales—general circulation requirements for newspaper**
   In order for a newspaper to meet the requirement for publishing notices of tax lien sales that it be one of general circulation to actual paid subscribers in the taxing unit, (1) it must have a content that appeals to the public generally; (2) it must have more than a *de minimis* number of actual paid subscribers in the taxing unit; (3) its paid subscriber distribution must not be entirely limited geographically to one community, or section, of the taxing unit; and (4) it must be available to anyone in the taxing unit who wishes to subscribe to it.

4. **Notice § 2; Taxation § 39.2— publication of notices of tax lien sales—newspaper meeting general circulation requirements**
   *The Old Fort Dispatch*, a weekly newspaper published in McDowell County, qualifies under the statutory "general circulation" provisions for publica-

tion of notices of ad valorem tax lien sales where it carries items of interest to the general public; it has 499 paid subscribers in the county; subscribers are predominantly located in the Old Fort area, but 77 are also located in Marion; one or more subscribers live on all ten of the rural postal routes; and it is available to anyone in McDowell County.

Justice MEYER concurring in result.

Chief Justice BRANCH joins in the concurring opinion.

Justice CARLTON dissenting.

Justice HUSKINS joins in the dissenting opinion.

ON appeal pursuant to G.S. 7A-30(2) from a divided panel of the Court of Appeals, 50 N.C. App. 705, 275 S.E. 2d 226, affirming a judgment of *Judge Ferrell* entered 24 December 1979 in MCDOWELL Superior Court.

*Goldsmith & Goldsmith, by C. Frank Goldsmith, Jr., for plaintiff appellants.*

*Story, Hunter, and Evans, P.A., by Robert C. Hunter, and Carnes and Little, by Stephen R. Little, for defendant appellees.*

EXUM, Justice.

The principal question presented on this appeal is whether *The Old Fort Dispatch,* a weekly newspaper published in McDowell County, qualifies under the "general circulation" provisions of G.S. 1-597[1] and G.S. 105-369(d)[2] for publication of notices

---

1. "§ 1-597. *Regulations for newspaper publication of legal notices, advertisements, etc.* — Whenever a notice or any other paper, document or legal advertisement of any kind or description shall be authorized or required by any of the laws of the State of North Carolina, heretofore or hereafter enacted, or by any order or judgment of any court of this State to be published or advertised in a newspaper, such publication, advertisement or notice shall be of no force and effect unless it shall be published *in a newspaper with a general circulation to actual paid subscribers* which newspaper at the time of such publication, advertisement or notice, shall have been admitted to the United States mails as second class matter in the county or political subdivision where such publication, advertisement or notice is required to be published, and which shall have been regularly and continuously issued in the county in which the publication, advertisement or notice is authorized or required to be published, at least one day in each calendar week for at least twenty-five of the twenty-six consecutive weeks immediately preceding the date of the first publication of such advertisement, publication or notice; provided that in the event that a newspaper otherwise meeting the qualifications and having the characteristics prescribed by §§ 1-597 to 1-599, should fail for a period not exceeding four weeks in any calendar year to publish one or more of its issues such newspaper shall nevertheless be deemed to have complied with the requirements of regularity and continuity of publication prescribed herein." (Emphasis supplied.)

of ad valorem tax lien sales. Both Judge Ferrell and a majority of the Court of Appeals (Judges Hedrick and Robert Martin, Judge Clark dissenting) concluded that the newspaper qualified. We agree and affirm the decision of the Court of Appeals.

Plaintiffs published *The McDowell News*, one of two newspapers published in McDowell County at the time of the incident giving rise to this action. The other one is *The Old Fort Dispatch*. Until 1979 McDowell County published its tax lien sales notices in *The McDowell News*. In 1978 *The McDowell News* raised its rates for such notices from $1.95 per column inch to $2.20 per column inch. Noting that a rate of $1.15 per column inch could be obtained from *The Old Fort Dispatch*, McDowell County's tax collector and its manager, after consultation with the County Board sitting as the Board of Equalization and Review, determined to publish all of the county's notices of tax lien sales for 1978 delinquent taxes in *The Old Fort Dispatch*. Pursuant to this determination such notices were published in *The Old Fort Dispatch* in May 1979. At its 1 June 1979 meeting the County Board unanimously ratified this action.

Plaintiffs, in their capacities as McDowell County taxpayers and as publishers of the only McDowell County newspaper qualified, they contend, to publish tax lien sales notices, bring this action. They seek a judgment declaring invalid the decision of the tax collector and the county manager to publish such notices in *The Old Fort Dispatch* on the grounds, first, that this newspaper does not meet the "general circulation" provision of G.S. 1-597 and G.S. 105-369(d) and second, that the decision was not duly authorized by the County Board of Commissioners. Plaintiffs also seek to enjoin the county from such actions in the future. Defend-

---

2. "(d) Advertisement of Sale.—Notice of the time, place, and purpose of the tax lien sale shall be given by advertisement at some public place at the courthouse (in the case of county taxes) or city or town hall (in the case of municipal taxes) and by advertisement once each week for four successive weeks preceding the sale *in one or more newspapers having general circulation in the taxing unit.* The final newspaper publication shall be not less than five days before the date of the sale. If there is no newspaper having general circulation in the taxing unit, the advertisement shall be posted in at least one public place in each township (in the case of county taxes) or in at least three public places in the municipality (in the case of municipal taxes) in addition to the notice posted at the courthouse or city or town hall." (Emphasis supplied.)

ants in their answer allege essentially that *The Old Fort Dispatch* is a qualified newspaper for the publication of tax lien sales notices and that the decision to use it for such publications was properly made.

After hearing evidence, Judge Ferrell, sitting without a jury and upon full findings of fact, made conclusions of law and entered judgment in favor of defendants. A majority of the Court of Appeals affirmed. For the reasons which follow we agree with the foregoing decisions and affirm the Court of Appeals.

[1] We note first our agreement with the Court of Appeals' conclusion, for the reasons stated in Judge Hedrick's opinion, that the decision to place tax lien sales notices in *The Old Fort Dispatch* was properly made by the county on the ground either that the county tax collector himself could make this decision or, if he could not, the decision was duly ratified by the Board.

[2] We next conclude that in order to qualify to publish notices of tax lien sales a newspaper must meet the "general circulation" requirements of both G.S. 105-369(d), and G.S. 1-597.[3] General Statute 105-369(d) delineates the timing and placement requirements for notices of tax lien sales. These include advertisement at a public place and in a newspaper of general circulation. Section 1-597 sets forth the qualifications a newspaper must possess in order to be a valid medium for publication or advertisement of legal notices generally. One qualification is that it be a newspaper with a "general circulation to actual paid subscribers."

It is a basic principle of statutory construction that different statutes dealing with the same subject matter must be construed

---

3. We recognize that G.S. 1-597 may not apply to legal notices generally in certain situations. General Statute 1-599 states that "[t]he provisions of §§ 1-597 to 1-599 shall not apply in counties wherein only one newspaper is published, although it may not be a newspaper having the qualifications prescribed by § 1-597; nor shall the provisions of §§ 1-597 to 1-599 apply in any county wherein none of the newspapers published in such county has the qualifications and characteristics prescribed by § 1-597."

General Statute 105-369(d), however, provides, in the case of tax sales notices, for publication by posting of such notices in public places in the taxing unit when "there is no newspaper having general circulation in the taxing unit."

Thus, if no newspaper has general circulation in the taxing unit publication by posting of notice is all that is statutorily required.

*in pari materia* and reconciled, if possible, so that effect may be given to each. *Justice v. Scheidt, Commissioner of Motor Vehicles,* 252 N.C. 361, 113 S.E. 2d 709 (1960); *Town of Blowing Rock v. Gregorie,* 243 N.C. 364, 90 S.E. 2d 898 (1956). Clearly the legislature intended that G.S. 1-597 apply to all legal notices required to be published in newspapers. The sweeping, all inclusive nature of the introductory phrases of the statute demonstrate this intent; it provides that "[w]henever a notice . . . shall be authorized or required . . . to be published or advertised in a newspaper, such publication, advertisement or notice shall be of no force and effect unless it shall be published in a newspaper with a general circulation to actual paid subscribers." The "general circulation" provision in G.S. 105-369(d) does not conflict with its counterpart in G.S. 1-597. It simply specifies the geographic area, *i.e.,* "the taxing unit" in which there must be a newspaper of general circulation and the times at which publication must be made. Reading both statutes together and giving effect to each, we conclude that in order for a newspaper to qualify to publish notices of tax lien sales it must be a newspaper of general circulation to actual paid subscribers in the taxing unit.[4]

Since the taxing unit here is McDowell County the pivotal question becomes whether *The Old Fort Dispatch* is a newspaper of general circulation to actual paid subscribers in McDowell County.

On this issue the material evidence was fully developed before and the necessary facts found by Judge Ferrell. This evidence and Judge Ferrell's findings are set out at great length in Judge Hedrick's opinion. Essentially they are as follows:

---

4. G.S. 1-597 contains several other criteria which newspapers must meet in order to qualify to publish legal notices. The newspaper, in addition to meeting the "general circulation" criterion, must be a newspaper which

"at the time of such publication, advertisement or notice, shall have been admitted to the United States mails as second class matter in the county or political subdivision where such publication, advertisement or notice is required to be published, and which shall have been regularly and continuously issued in the county in which the publication, advertisement or notice is authorized or required to be published, at least one day in each calendar week for at least twenty-five of the twenty-six consecutive weeks immediately preceding the date of the first publication of such advertisement, publication or notice."

Since these criteria, it is conceded, are met by *The Old Fort Dispatch* we have no occasion to elaborate on them here.

*The Old Fort Dispatch* contains items of general interest to persons within and without McDowell County, with its masthead proclaiming its intent to serve Old Fort and McDowell County. It features local news and sports items of county-wide interest, political columns from congressmen and senators, human interest stories, jokes, cartoons, and religious and social news of interest throughout the county. It contains advertising from a great variety of businesses throughout the county. It has regularly published various legal notices since 1976.

The population of McDowell County is approximately 30,000 and in October 1978 there were 15,864 registered voters in the county. Of the registered voters, 11.7 percent live in Old Fort and 52.4 percent live in Marion, which is the county seat located in the eastern portion of the county and about ten miles east of Old Fort. Of the paid subscribers to *The Old Fort Dispatch*, 77 live in Marion, 33 live on six Marion rural routes, 162 live in Old Fort, 220 live on two Old Fort rural routes, and seven live in other parts of the county. There are 425 paid subscribers who live outside McDowell County.

In addition to copies to paid subscribers some 15 copies of the newspaper are delivered to Marion for sale from newsstands and paper racks and some 285 copies are delivered to Old Fort for similar sales. Approximately 40 to 50 copies are delivered to two newsstands in other areas in the county. All advertisers in *The Old Fort Dispatch* receive complimentary copies of the paper. This distribution is to a wide range of different businesses, public offices, government agencies, and libraries, in both Old Fort and Marion, the two major population centers. Approximately 330 complimentary copies go to the Marion area. There is substantial free distribution to the public, so that *The Old Fort Dispatch* customarily prints 1500 copies of its weekly edition. It printed 1700 copies, however, for the editions which contained the tax sale notices.

Plaintiffs contend that because *The Old Fort Dispatch* is distributed primarily in Old Fort, a town containing only 11.7 percent of the registered voters of the county and, more particularly, because there are only 117 paid subscribers for all of the county outside Old Fort, the newspaper does not meet the "general circulation to actual paid subscribers" criterion. In his dissent Judge

Clark agreed, noting that "the record on appeal indicates a paid circulation of 499 copies, 382 copies in Old Fort Township, and 117 copies in the remainder of the county with 88.3 percent of the population."[5] Defendants, on the other hand, argue that because *The Old Fort Dispatch* has content of interest to the general reader, is available throughout the county to all who wish to subscribe, and has more than a *de minimis* number of paid subscribers in the county, it satisfies the "general circulation" criterion of the statutes.

Since the meaning of the term "general circulation" is a question of first impression with us,[6] we look to decisions in other states construing statutes similar to ours for guidance.[7]

Cases from our sister jurisdictions make clear that the term "general circulation" when applied to newspapers refers not so much to the numerical or geographic distribution of the newspaper as it does to the contents of the paper itself. The primary consideration is whether the newspaper contains information of general interest. "Whether a newspaper is one of general circulation is a matter of substance, and not of size." *Burak v. Ditson*, 209 Iowa 926, 929, 229 N.W. 227, 228 (1930). Recognizing that "every newspaper is, in greater or less[er]

---

5. Judge Clark assumed that the voter registration figures accurately reflected the population distribution.

6. Although the case of *Jones v. Percy*, 237 N.C. 239, 74 S.E. 2d 700 (1953), dealt with whether a particular North Carolina newspaper satisfied the requirements of G.S. 1-597, the Court there did not define "general circulation." Rather the case turned on the trial court's failure to instruct the jury that the newspaper must have actual paid subscribers and on its allocation of the burden of proving that the newspaper satisfied the statutory requirements. The Court did not comment on the portion of the trial court's instructions stating that the *Washington Progress*, a Beaufort County newspaper, was a newspaper of "general circulation" if it was "distributed generally in Beaufort County" and if it carried "general news, advertisements, editorials, although these editorials were lifted from the *Washington Daily News* or some other newspaper." *Id.* at 241, 74 S.E. 2d at 702.

7. The question of the meaning of "general circulation" as used in the various statutes has usually arisen in the context of a challenge to an action taken by a government agency or private person after giving notice by publication. Specifically, the complaining party is generally the person against whom the action was taken and the cases involve an attack against the adequacy of the notice by publication under the relevant statutes. *See, e.g., Moore v. State*, 553 P. 2d 8 (Alaska 1976); *Lynn v. Allen*, 145 Ind. 584, 44 N.E. 646 (1896); *Burak v. Ditson*, 209 Iowa 926, 229 N.W. 227 (1930).

degree, devoted to some special interest," *Lynn v. Allen,* 145 Ind. 584, 587, 44 N.E. 646, 647 (1896), the courts have examined the content of the newspaper to determine if its avowed purpose, manifested by its actual content, is to attract and serve more than a particular class or calling in the community. As summarized in *Burak v. Ditson, supra,* 209 Iowa at 930, 229 N.W. at 228:

> "A study of the decisions bearing on the question before us suggests the following criteria: First, that a newspaper of general circulation is not determined by the number of its subscribers, but by the diversity of its subscribers. Second, that, even though a newspaper is of particular interest to a particular class of persons, yet, if it contains news of a general character and interest to the community, although the news may be limited in amount, it qualifies as a newspaper of 'general circulation.' " (Citations omitted.)

Thus, courts have deemed a number of newspapers to be ones of general circulation because they contained news of general interest, despite their primary appeal to a particular group in the community. For example, in *Burak,* the paper specialized in news of legal matters but contained some general information. Its subscribers numbered between four and five hundred and included "[a]ttorneys, automobile dealers, repair shops . . . wall paper companies, undertaking establishments, newspapers, florists, storage houses, drug stores, and individuals." *Id.* at 928, 229 N.W. at 228.

In *Hesler v. Coldron,* 29 Okla. 216, 116 P. 787 (1911), the court interpreted its pertinent statute requiring notice to "be published in a newspaper of the county having general circulation therein." The court held that the *Daily Legal News,* with "a circulation of from 205 to 215, among bankers, merchants, lawyers, real estate agents, insurance agents, wholesale merchants, hardware merchants, physicians, and almost every class of business in the country [and] circulated in almost every town in the county," *Id.* at 218, 116 P. 2d at 787, met the statutory requirement.

Similarly, in *Shulansky v. Michaels,* 14 Ariz. App. 402, 484 P. 2d 14 (1971), the challenged document was the county's official newspaper. It carried news on a variety of topics and had subscribers from different professions, but dealt primarily with legal and business news. Its circulation numbered 2,169 in

Phoenix, and it was sold through newsstands, coin boxes and by delivery to paid subscribers. These circumstances were held sufficient to satisfy the statutory requirements that notice of the sale of a treasurer's tax deed be in "a newspaper of general circulation published in the area in which the property is located" despite a circulation of only five people within a one mile radius of the property. *Id.* at 404-05, 484 P. 2d at 15-17. *See also, Lynn v. Allen, supra,* 145 Ind. 584, 44 N.E. 646 (newspaper primarily devoted to news of legal community with circulation of 550 in Indianapolis and 2500 throughout the state was a paper of "general circulation"); *Hanscom v. Meyer,* 60 Neb. 68, 82 N.W. 114 (1900); *Puget Sound Pub. Co. v. Times Printing Co.,* 33 Wash. 551, 74 P. 802 (1903) (newspaper publishing primarily legal news with 750-1000 subscribers in Seattle qualified as paper of "general circulation").

Other cases have dealt with newspapers directed at special groups other than the legal community. In *State ex rel. Miami Leathercote Co. v. Gray,* 39 So. 2d 716 (Fla. 1949), *The Jewish Floridian* was held to be a newspaper of general circulation in which legal notices of corporate dissolution could be published. Similarly, the *Ohio Jewish Chronicle* was held to be a newspaper of general circulation in the county in which it was published. *In Re Castanien,* 15 Ohio Op. 161, 164 (1939). The court examined the paper and determined that the greatest portion of the news pertained to the Jewish community, but there were other topics of general interest presented. Although the majority of the 1500 to 1800 subscribers were Jewish persons, several hundred went to non-Jewish persons and organizations. *Focusing on the content of the paper, rather than the extent of circulation,* the court held this paper qualified as a newspaper of general circulation.

California courts have held a newspaper primarily devoted to news of labor unions, with three-fourths of its distribution among persons affiliated with labor unions, to be a newspaper of "general circulation." *In Re Labor Journal,* 190 Cal. 500, 213 P. 498 (1923). A newspaper printed almost entirely in Spanish, with 15,000 paid circulation has been held to be a newspaper of "general circulation." In reaching this conclusion it focused on "the content of the newspaper and not the persons to whom it appeals." *In re La Opinion,* 10 Cal. App. 3d 1012, 89 Cal. Rptr. 404 (1970). In contrast, a newspaper that almost exclusively dealt with

information about the construction industry was found not to be a newspaper of general circulation because it lacked news of general interest. *In Re David*, 98 Cal. App. 69, 276 P. 419 (1929).

On the other hand, courts have acknowledged, as did the court in *Lynn v. Allen, supra*, 145 Ind. at 587, 44 N.E. at 647, that some periodicals have content of such limited scope they cannot qualify as a newspaper of general circulation. "There is no doubt that where a publication is devoted purely to a special purpose it would be an unfit medium to reach the general public. A medical, literary, religious, scientific or legal journal is professedly but for one class, and that class but a comparatively small part of the whole population; and it would be manifestly unjust, as well as against the letter and spirit of the statute, to use such a journal for the publication of a notice affecting the property or personal rights of citizens in general."

Although courts have focused on content in defining "general circulation," the term is not devoid of quantitative aspects. "The proper construction of the term 'general circulation' requires consideration of both the qualitative and quantitative aspects of the publication." *Moore v. State*, 553 P. 2d 8, 21 (Alaska 1976). In *Moore* the *Anchorage Times* was held to be a "newspaper of general circulation in the vicinity" even though it had a circulation of only 130 in a town with a population of 3,500. "The number of readers, albeit small, was not so insignificant that the newspaper would fail to reach a diverse group of people in the community." *Id.* at 21-22. The court noted that "a statistical analysis for the issue at hand would be most inappropriate because size of readership is only one factor which must be considered in determining whether a particular newspaper is one of general circulation." *Id.* at 22, n. 21.

At issue is *Ruth v. Ruth*, 39 Ind. App. 290, 79 N.E. 523 (1906), was whether the *Morgantown Truth* was a newspaper of general circulation in the county. An examination of the paper itself revealed it was "manifestly intended for general circulation." *Id.* at 293, 79 N.E. at 524. Its circulation numbered 520, two-thirds of which was in the county. Although it circulated in six or seven townships, one-half of that circulation was concentrated in two townships and no copy was sent to four towns in the county. There were two other papers that circulated generally throughout the county, one with a circulation of 1800 and the

other with 1000 or 1100. Yet the court held this to be sufficient evidence to support the finding that the *Morgantown Truth* was of general circulation because "[n]o fixed number of subscribers is required to constitute general circulation. A newspaper's circulation does not necessarily mean that it is read by all the people of the county or township. As a matter of fact, county newspapers are devoted to local interests, and of limited circulation." *Id.*

In determining whether a newspaper was "a secular newspaper of general circulation published in the city, town or county," the court in *People v. South Dearborn Street Bldg. Corp.*, 372 Ill. 459, 462, 24 N.E. 2d 373, 374 (1939), recognized previous decisions holding

> "that by the use of the words 'general circulation' the legislature intended that of a general newspaper as distinguished from one of special or limited character; a newspaper that circulates among all classes and is not confined to a particular class or calling in the community. *Eisenberg v. Wabash*, 355 Ill. 495, 189 N.E. 301, *Polzin v. Rand, McNally & Co.*, 250 Ill. 561, 95 N.E. 623."

In *South Dearborn*, the court specifically addressed the question whether distribution must be general throughout the municipal district. It concluded that to require that a newspaper have "a general circulation throughout the area of the city, county, or State or forest preserve district, is to require something that is not in the statute." *Id.* The court, *id.* at 461-62, 24 N.E. at 374-75, recognized the practical considerations in a state in which many counties have newspapers with limited circulation:

> "No Illinois authorities have been called to our attention holding that the circulation of a newspaper designated by law for publication purposes must be general throughout the municipal area. Throughout the many counties in Illinois newspapers are published whose circulation, in many instances, is limited to a village, small town or neighborhood. Newspapers of this class have been used for many years as the medium of publications required by law and, in the few instances where their sufficiency has been questioned, the question was not based upon how thoroughly the newspaper was circulated throughout the area under consideration. There are many counties containing several small cities, each

of which has its main newspaper circulating to a very large extent in the immediate neighborhood, but not generally throughout the county or State, which has been used for legal publications."

Thus, it concluded that a newspaper with a circulation of 6000, largely in the southeast part of Chicago but with a few subscribers elsewhere in the city and county, was a newspaper of "general circulation" in the forest preserve district of Cook County.

In *Wahl v. Hart*, 85 Ariz. 85, 332 P. 2d 195 (1958), however, a newspaper with no subscribers in the relevant district, was held not to meet the statutory requirement of "general circulation within the proposed district." The court stated, *id.* at 87, 332 P. 2d at 196-97:

> "We do not mean to suggest from [decisions cited] that a ratio of circulation to population is to be inferred. We simply conclude that the term is not wholly devoid of a quantitative connotation. *It implies a necessity for some circulation among those affected by the contents of the notice.*" (Emphasis supplied.)

A second case that concluded the paper at issue was not one of "general circulation" was *Times Printing Co. v. Star Pub. Co.*, 51 Wash. 667, 99 P. 1040 (1909). In that case the court equated "general" with "extensive" and found that a circulation of 1000 at a time when Seattle had a population of 242,000 was insufficient to qualify as "general circulation." Upon several bases it distinguished its precedent of *Puget Sound Pub. Co. v. Time Printing Co., supra*, 33 Wash. 551, 74 P. 802, which held that a paper which circulated among all classes of people in Seattle, and with 750-1000 subscribers in a population of 121,813 was a newspaper of "general circulation." The newspaper in *Puget Sound* had regular subscribers, was read by 3000 people, circulated among all classes of people, and had regularly published legal notices. The newspaper in *Times Printing Co.* was sold only on the street in the business district, and there was no evidence that it was read by any more than 1000 purchasers or that legal notices had ever been published in it. Furthermore, the population of Seattle had doubled since the *Puget Sound* case. *Times*

*Printing Co. v. Star Pub. Co., supra,* 51 Wash. at 671-72, 99 P. at 1041-42.

Thus, the Washington Supreme Court emphasized two elements of the quantitative aspect of the term "general circulation." It examined the number of subscribers in relation to the population in the relevant area, and it examined the geography of the newspaper's distribution.

A number of courts have concluded that a newspaper qualifies as one of "general circulation," despite a relatively small numerical distribution. *See, e.g.,* in addition to cases already discussed, *Board of Com'rs. of Decatur County v. Greensburg Times,* 215 Ind. 471, 19 N.E. 2d 459 (1939); *State v. Board of County Com'rs.,* 106 Mont. 251, 76 P. 2d 648 (1938); *Robinson v. State,* 143 S.W. 2d 629 (Tex. 1940).

Courts have varied in the significance they have attached to the geographic distribution of the newspaper in determining whether it is one of general circulation. The *Hesler, Shulansky, Ruth* and *South Dearborn* courts believed a newspaper need not be distributed in every part of the county in order to qualify as one of general circulation. In *Hesler,* the Oklahoma Supreme Court noted that the newspaper "circulated in *almost* every town in the county" in determining that it was one of general circulation. *Hesler v. Coldron, supra,* 29 Okla. 216, 218, 116 P. 787. (Emphasis supplied.) The newspaper in *Shulansky* was held to be one of general circulation in the county although it was distributed to only five people within a one mile radius of the property. *Shulansky v. Michaels, supra,* 14 Ariz. App. 402, 404-05, 484 P. 2d 14, 15-17. The Indiana Court of Appeals and the Illinois Supreme Court dealt with the geographic distribution question in factual situations very similar to the one now before us. In both *Ruth v. Ruth, supra,* 39 Ind. App. 290, 79 N.E. 523, and *People v. South Dearborn Street Bldg., supra,* 372 Ill. 459, 24 N.E. 2d 373, the courts concluded that newspapers were ones of general circulation even though their distribution was generally confined to a particular portion of the county.

In contrast, some courts have required distribution to be throughout the county. In a cursory, one paragraph treatment of the question, a New York trial court inferred that the legislature intended that a newspaper be distributed throughout the entire area and that it contain matters of general interest in order to

qualify as a "newspaper having general circulation." *Barrett v. Cuskelly*, 52 Misc. 2d 250, 275 N.Y.S. 2d 280, 284 (1966), *aff'd*, 28 A.D. 2d 532, 279 N.Y.S. 2d 380 (1967). In reaching this conclusion the court discussed only the number of readers in the district, however, and not their geographic location in the district. In *State v. Board of County Com'rs.*, 106 Mont. 251, 76 P. 2d 648 (1938), the court noted that the newspaper reached every community in the county in finding that the newspaper was one of general circulation.

We now compare our statutory requirement that the newspaper's general circulation be "to paid subscribers" with formulations in other jurisdictions. A California statute contains language similar to our own when it states that to qualify for the publication of legal notices a newspaper published in the county must, among other things, have "a *bona fide* subscription list of paying members." *See In re Green*, 21 Cal. App. 138, 131 P. 91, 92 (1913). (Current version of statute in Cal. Gov't Code §§ 6000-01 (West 1980)). In *Application of Herman*, 183 Cal. 153, 191 P. 934 (1920), the court held that the newspaper in question, although not one of general circulation because it contained no news of general interest, did meet the *bona fide* subscription criterion because it had 25 subscribers in various lines of business "in ten cities and towns, scattered through three counties, among at least ten 'professions, trades, and callings.'" *Id.* at 165, 191 P. at 939. Because the legislature did not require a minimum number of paid subscribers the court held that its determination on this issue "must depend largely upon the diversity of . . . subscribers rather than upon mere numbers." *Id.* (*Quoting In re Green, supra*, 21 Cal. App. 138, 131 P. 91).

A second California statute provides that for a newspaper not published in the county to qualify it must have "a *substantial distribution* to paid subscribers in the city, district, or judicial district," a requirement not imposed on papers published in the county. Cal. Gov't Code § 6008 (West 1980). (Emphasis supplied.) In construing this statute the California Appellate Court has held that a newspaper with only twelve paid subscribers out of a population of 79,000 did *not* qualify. *In re Carson Bulletin*, 85 Cal. App. 3d 785, 149 Cal. Rptr. 764 (1978).

These California cases demonstrate the difference between statutory language requiring *"substantial distribution* to paid

subscribers" and language, like our statute, requiring that there be a *"general circulation* to paid subscribers." "Substantial distribution" obviously refers more to the quantitative aspects of a paper's geographic coverage; whereas "general circulation" refers more to the qualitative aspects of its contents.

Other statutory formulations are more specific in terms of paid circulation requirements than ours. Kentucky requires that the newspaper "have the largest bona fide circulation in the publication area" and be "paid for by not less than fifty per cent (50%) of those to whom distribution is made." In addition, it must be "circulated generally in the area." Ky. Rev. Stat. § 424.120(1)(b) (1970) (several additional requirements specified). Wisconsin requires that a newspaper be published in the relevant city or town, have a *bona fide* paid circulation that constitutes at least 50 percent of its circulation, and have actual subscribers to 1000 copies in "1st or 2d class" cities or 300 copies in "3rd and 4th class" cities. Wisc. Stat. Ann. § 985.03 (West 1981). Idaho and Minnesota also have a statutory minimum number of paid subscribers required to qualify as a newspaper for printing legal notices. *See* Idaho Code § 60-106 (1976) (200 *bona fide* subscribers living in the county); Minn. Stat. § 331.02(4) (West 1981) (500 subscribers or free circulation to 500 required).

[3]   Considering, therefore, the relatively general language of our statutory formulation in light of decisions construing similar language and the more specific statutory formulations from our sister states, we conclude that for a newspaper to be one of general circulation to actual paid subscribers in the taxing unit it must meet this four-pronged test. First, it must have a content that appeals to the public generally. Second, it must have more than a *de minimis* number of actual paid subscribers in the taxing unit. Third, its paid subscriber distribution must not be entirely limited geographically to one community, or section, of the taxing unit. Fourth, it must be available to anyone in the taxing unit who wishes to subscribe to it.

To have a content that appeals to the public generally, the newspaper should contain items of general interest. Although a newspaper may be primarily directed to a particular locality or group, it must nevertheless contain some items of interest to persons who do not live in that locality or who are not members of that group. These items of general interest may include national,

state, or county news; editorials; human interest stories; and advice columns, among others. The possibilities are endless.

The requirement that there be more than a *de minimis* number of actual paid subscribers in the taxing unit derives from the proposition, already noted, that the term "general circulation" in itself is not devoid of quantitative aspects and, further, from our statute which expressly adds the "paid subscriber" limitation. In order to satisfy the quantitative considerations inherent in the term "general circulation," the newspaper must enjoy more than a *de minimis* number of readers in the taxing unit. This number must not be so insignificant that the newspaper simply fails "to reach a diverse group of people" in the area prescribed. *See Moore v. State, supra,* 553 P. 2d 8, 21-22. To determine under our statute whether more than a *de minimis* number of readers exists only actual paid subscribers may be considered.[8] Our statute, however, mandates no minimum number of paid subscribers and requires no minimum ratio of paid subscribers to population. To impose such minimums would be to require something more than specified by the statute. Whether a given newspaper has a *de minimis* number of subscribers must always be determined in context. What may be a *de minimis* number in Mecklenburg County may not be in Dare County.

The need for more than a *de minimis* number of paid subscribers does not mean, however, that those subscribers must be evenly distributed in every city, town or section of the county or taxing unit. Nor must publication be in the paper with the widest geographical distribution in the county. Neither G.S. 1-597 nor G.S. 105-369(d) so require.

To hold that a newspaper must have significant distribution in every community or section in the taxing unit would be to ig-

8. In this connection, plaintiffs correctly argue that unpaid distribution such as complimentary copies may not be considered in determining whether *The Old Fort Dispatch* meets this prong of the test. Nor may sales other than those to paid subscribers be considered in light of explicit statutory direction that we consider only sales "to actual paid subscribers." Thus, both free distribution and sales from newsstands and vending racks are excluded from consideration under our statute.

We agree, however, with the Court of Appeals' conclusion that even if Judge Ferrell erroneously admitted and considered this evidence, there was competent evidence of a sufficient number of paid subscribers which standing alone was enough to support Judge Ferrell's findings and conclusions in favor of defendants.

nore the demographic and geographic realities in North Carolina. The case now before us illustrates the problem. McDowell County is located in the western, mountainous region of the state. Pisgah National Forest extends through most of the northern and western portions of the county. In consequence, the population of the county is largely found in the central and southeastern sections. Thus, a newspaper could be adequately distributed within the more populated regions, without reaching every hollow and gap in the county.

Neither need a newspaper have significant distribution throughout the populated regions of a taxing unit. Frequently, in North Carolina, as is the situation presented here, counties have two or more newspapers, each with primary distribution in one community and more limited distribution in other communities or rural areas. Without more specific legislative limitations than "general circulation to actual paid subscribers in the taxing unit" we are unwilling to hold that the legislature intended to eliminate from participation in tax sales notice advertising the many legitimate general interest newspapers which exist throughout North Carolina but which have limited geographical distribution. All that is required under the third prong of the test is that the newspaper's paid subscribers not be located entirely in one community or geographic section of the taxing unit.

Finally, the newspaper must be available to the general public in the taxing unit. This means that anyone in the area may subscribe to the paper and receive delivery. In other words, subscriptions may not be limited to persons in a particular neighborhood or other lesser geographic area than the taxing unit or to members of a particular group therein.

[4] When we apply this test to the facts at bar, *The Old Fort Dispatch* passes. It is a newspaper which carries items of interest to the general public. It has 499 paid subscribers in the county — far more than a *de minimis* number. Subscribers are predominantly located in the Old Fort area, but 77 are also located in Marion. One or more subscribers live on all ten of the rural postal routes. It is available to anyone in McDowell County.

In conclusion we desire to make clear that we are deciding only that *The Old Fort Dispatch* qualifies under the statutory criteria for publishing notices of tax lien sales. Plaintiffs argue vigorously in support of their contentions that notices in *The Old Fort Dispatch* will not comport with constitutional due process. Whether notices of tax lien sales or any other kind of legal notice in *The Old Fort Dispatch* satisfies due process is a question which is not and cannot now be before us. Such a question cannot be decided in the abstract. It can only be decided in the context of a case in which a party entitled to notice claims that notice deficiencies denied that party due process. The resolution of such a claim then hinges on the facts and circumstances in the particular case regarding the manner in which notice was given and the process which was constitutionally due. There could be instances arising in McDowell County, for example, in which due process requirements would be more nearly satisfied by publication in *The Old Fort Dispatch* than in *The McDowell News*, and vice versa. These kinds of decisions must await determination on a case by case basis.

For the reasons given, therefore, the decision of the Court of Appeals is

Affirmed.

Justice MEYER concurring in result.

I concur in the result reached by the majority that the Old Fort Dispatch satisfies the statutory criteria for publishing notices of tax lien sales. I believe, however, that the majority opinion fails to adequately emphasize that the newspaper should be one whose circulation (*i.e.,* distribution) reaches the general body of the taxpayers in the county as was, in my view, intended by the legislature.

Chief Justice BRANCH joins in this concurring opinion.

Justice CARLTON dissenting.

The result in this particular case does not particularly disturb me although I think Judge Clark's dissent in the Court of Appeals expresses the better view. I am the first to concede that the facts disclosed by this record present a close case to call.

I strongly dissent, however, to the formula adopted by the majority to determine whether a newspaper is one of general circulation in this and future cases.

My primary concern is with the third of the four-pronged test adopted by the majority. It provides that, "subscriber distribution must not be entirely limited geographically to one community, or section, of the taxing unit." This, read with other parts of the test, could lead to ridiculous results which I can best illustrate by a hypothetical.

Suppose County A, with a population of 40,000, has 20 townships. Townships 1 and 20, at opposite ends of the county, have the greatest percentage of the county's population; each has 11,000 people. The remainder of the county's population is about evenly divided between the remaining 18 townships; each has a population of approximately 1,000 people. Each of these 2 townships has a town with a newspaper which meets requirements 1, 2 and 4 of the majority's formula. That is, both papers have a content which appeals to the public generally, both have more than a *de minimis* number of paid subscribers in the taxing unit and both papers are available to anyone in the taxing unit who wishes to subscribe to it. The newspaper in Township 1 has a paid circulation of 500; 499 in Township 1. One person outside Township 1, the county tax collector who lives in Township 20, also subscribes to the paper.

Under the formula adopted by the majority, the paper will qualify as one of "general circulation" since it meets the requirements of parts 1, 2 and 4 of the formula and, since one person outside the township is a paid subscriber, the paper, under step 3, is "not entirely limited geographically to one community, or section, of the taxing unit."

While unimportant to the decision concerning the paper in Township 1, the paper in Township 20 has a paid circulation of 400 in Township 20 and no less than 10 subscribers in every other

township. I agree with the majority that Township 20's paper should qualify as one of general circulation.

The result qualifying the paper in Township 1, however, as one of "general circulation" is simply absurd. I cannot imagine that our legislature intended for notice to have such little meaning.

That our legislature intended that such notices be circulated in *every township* of a county is demonstrated by the statute itself. G.S. 105-369(d) provides that if a county has no newspaper of general circulation, advertisements should be posted in *at least* one public place *in each township.* Clearly, the statute contemplates *countywide* notice. Why else would the legislature require a posted notice in Township 17 for a tax lister who resides on his only property in Township 3? The answer, of course, is that the legislature intended for "the word to get around." Under the majority's formula, I submit, the word will not "get around." An advertisement is also required to be posted at the county courthouse *even with* the notices to run in the newspapers. Moreover, the statute does not limit the notice to *a* paper of general circulation. The statute provides that notice shall be run for four successive weeks in *"one or more* newspapers having general circulation in the taxing unit." From all of this, it is crystal clear that our legislature considered notice to delinquent taxpayers far more important than does the majority of this Court.

I would vote to make the third prong more stringent: that the paid subscriber distribution must be more than *de minimis* in a substantial number of townships within the taxing unit. This requirement will ensure that the notice will have wide geographic distribution. Such I believe is inherent in the statutory requirement of general circulation.

I vote to reverse the decision of the Court of Appeals.

Justice HUSKINS joins in this dissenting opinion.