# 9 PETTIPAUG, LLC, ET AL. *v.* PLANNING AND ZONING COMMISSION OF THE BOROUGH OF FENWICK
## (SC 20838)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Ecker, Alexander and Dannehy, Js.

*Syllabus*

The plaintiffs, which owned real property in the borough of Fenwick, appealed to the trial court from the decision of the defendant planning and zoning commission approving certain amendments to Fenwick's zoning regulations. Fenwick is located entirely within the town of Old Saybrook and is an exclusively residential, largely seasonal community of sixty-seven summer residences and fourteen year-round households. The commission had adopted the amendments in July, 2019, and notice of the commission's decision was published in The Middletown Press (Press) a few days later. The Press is an online and print publication, and the print version is available for purchase at nine retailers, several of which are in the part of Old Saybrook that serves as the primary commercial area for Fenwick residents. None of Fenwick's year-round households subscribe to any version of the Press, but viewers may access the legal notices section of the Press' website for free and without a subscription. The plaintiffs filed their appeal with the trial court in October, 2019. They claimed, inter alia, that the commission had unlawfully adopted the amendments by failing to publish notice of its decision "in a newspaper having a substantial circulation in the municipality" of Fenwick, in violation of the statute (§ 8-3 (d)) governing the adoption of and amendment to zoning regulations. The commission moved to dismiss the plaintiffs' appeal, claiming that it was untimely because it had not been filed within fifteen days of the publication of the notice, as required by the statute (§ 8-8 (b)) governing appeals from decisions of zoning commissions. The trial court, however, denied the motion to dismiss, concluding that the appeal was timely filed under the savings provision of § 8-8 (r) because the commission had not published notice of its decision in a newspaper having a "substantial circulation" in Fenwick, as required by § 8-3 (d). The plaintiffs then moved for summary

349 Conn. 268          JUNE, 2024                   269

9 Pettipaug, LLC *v.* Planning & Zoning Commission

judgment with respect to their sole remaining claim, namely, that the commission had unlawfully adopted an amendment concerning short-term rentals by failing to publish notice of that amendment in a newspaper having a substantial circulation in Fenwick. The trial court followed its analysis in connection with its denial of the motion to dismiss and concluded that the commission's failure to publish the amendment in a newspaper having a substantial circulation in Fenwick rendered it ineffective as a matter of law under § 8-3 (d). Accordingly, the trial court granted the plaintiffs' motion for summary judgment and rendered judgment thereon, from which the commission, on the granting of certification, appealed to the Appellate Court. The Appellate Court affirmed the trial court's judgment. The Appellate Court concluded that the meaning of the term "substantial circulation" was plain and unambiguous and that it was quantitative in nature, insofar as it is informed by the number of subscriptions or copies sold and is focused primarily on the extent of the publication's dissemination. Emphasizing that none of Fenwick's households subscribed to the Press, and discounting the online availability of the Press, the Appellate Court concluded that the Press did not have a "substantial circulation" in Fenwick for purposes of § 8-3 (d). On the granting of certification, the commission appealed to this court.

*Held* that the commission properly published notice of its decision in "a newspaper having a substantial circulation in the municipality" of Fenwick for purposes of § 8-3 (d), and, accordingly, this court reversed the Appellate Court's judgment, remanded the case, and ordered reversal of the trial court's judgment and dismissal of the plaintiffs' zoning appeal:

It was undisputed that Fenwick was the relevant municipality and that the Press was a newspaper for purposes of § 8-3 (d), but the parties disagreed as to whether the Press had a "substantial circulation" in Fenwick, and, because the statutory scheme did not define that term, this court consulted various dictionary definitions for insight into its meaning and concluded that the term was ambiguous, insofar as the lack of any guidance as to how to measure the requisite circulation gave rise to multiple, reasonable interpretations.

Moreover, there was no legislative history shedding light on the meaning of the term "substantial circulation," and, even though numerous Connecticut statutes require publication of notice in a newspaper having a substantial circulation, there was scant case law concerning the meaning of that term, the only Connecticut case on point was of minimal guidance because it was decided before the print journalism industry had been drastically reshaped by the Internet, and case law from other states also was of little help in the age of the Internet.

Nonetheless, this court's case law revealed that the purpose of the statutory newspaper notice requirement was to provide constructive notice

that would inform as much of the population as possible of contemplated zoning actions and that failure to give proper notice constitutes a jurisdictional defect that renders the action of the commission null and void.

Although the legislature's use of different terms within the same statute generally suggests that the legislature intended the terms to have different meanings, that principle does not apply when its application would constitute a failure to give meaning to the statute in its entirety and in its overall context, and, thus, to inform its construction of § 8-3 (d), this court looked to the long established legal term of art, "newspaper of general circulation," which is used by the majority of others states and appears in numerous Connecticut statutes, including § 8-3 (g) (1), and determined that the meanings of the terms "general circulation" and "substantial circulation" had to be harmonized for the statutory scheme to have coherency.

The phrase "newspaper of general circulation" has qualitative characteristics, insofar as it must contain news and information of interest to the general public and be available to the public within a certain geographic area, as well as quantitative aspects, and, although this court acknowledged that the number of subscribers or the ratio of subscribers to the population may furnish relevant evidence of a newspaper's availability and coverage of matters of local interest, it rejected a rigidly mathematical inquiry that focuses only on subscriber numbers in favor of an inquiry that considers the type of news covered by the publication and its general availability in the municipality.

Consequently, this court adopted an availability centered test for determining whether a newspaper has a substantial or general circulation in a municipality, pursuant to which the court first must determine whether the newspaper contains general news content of local interest to the applicable community, and then considers the availability of the newspaper to the community, as demonstrated by where and how the newspaper is distributed, the frequency of distribution, the existence of any cost barriers to access, whether the newspaper is consistently used for such notices and for how long, and whether residents are aware of that newspaper's use for the publication of legal notices.

In the present case, there was no claim that the local news content in the Press was not of general interest to Fenwick residents, the Press was accessible and readily available insofar as it was sold at several locations in the commercial area of Old Saybrook serving Fenwick residents, the Press was accessible online, with the public notice section available at no charge to the viewer, and deference to the commission's decision to publish notice in the Press was further warranted by virtue of the fact that the borough's various governing bodies, including its board of warden and burgesses, as well as its historic district commission, had used that publication for notice purposes for decades, especially

9 Pettipaug, LLC *v.* Planning & Zoning Commission

when residents of most of Fenwick's households had previously served on those governing bodies.

Accordingly, this court concluded that the Press was a newspaper of substantial circulation in Fenwick within the contemplation of § 8-3 (d), and, because the commission complied with the statutory publication requirement, the plaintiffs no longer benefited from the savings provision in § 8-8 (r), and dismissal of their zoning appeal, which was filed more than fifteen days after the date that notice of the commission's decision was published, was required.

Argued December 11, 2023—officially released June 18, 2024

*Procedural History*

Appeal from the decision of the defendant approving an amendment to its zoning regulations brought to the Superior Court in the judicial district of Middlesex and transferred to the judicial district of Hartford, Land Use Litigation Docket, where the court, *Baio, J.*, denied the defendant's motion to dismiss; thereafter, the court, *Baio, J.*, granted the plaintiffs' motion for summary judgment and rendered judgment thereon, from which the defendant, on the granting of certification, appealed to the Appellate Court, *Prescott*, *Cradle* and *DiPentima*, *Js.*, which affirmed the trial court's judgment, and the defendant, on the granting of certification, appealed to this court. *Reversed*; *judgment directed.*

*Michael A. Zizka*, for the appellant (defendant).

*Richard P. Weinstein*, with whom, on the brief, was *Sarah Black Lingenheld*, for the appellees (plaintiffs).

*Proloy K. Das* filed a brief for the Connecticut Conference of Municipalities as amicus curiae.

*Evan J. Seeman* and *Scott T. Garosshen* filed a brief for the Connecticut Chapter of the American Planning Association et al. as amici curiae.

*Opinion*

ROBINSON, C. J. This certified appeal requires us to consider a significant question in this time of great

9 Pettipaug, LLC *v.* Planning & Zoning Commission

change in the local journalism industry, namely, how a publication qualifies as "a newspaper having a substantial circulation in the municipality" for purposes of providing constructive notice of that municipality's promulgation of zoning regulations under General Statutes § 8-3 (d).[1] The defendant, the Planning and Zoning Commission of the Borough of Fenwick (commission), appeals, upon our grant of its petition for certification,[2] from the judgment of the Appellate Court affirming the judgment of the trial court in favor of the plaintiffs, 9 Pettipaug, LLC, and Eniotna, LLP.[3] *9 Pettipaug, LLC* v. *Planning & Zoning Commission*, 217 Conn. App. 714, 717, 737, 290 A.3d 853 (2023). On appeal, the commission claims that the Appellate Court incorrectly concluded that its publication of notice in The Middletown Press (Press) of an amended zoning regulation did not comply with § 8-3 (d) because none of Fenwick's fourteen year-round households subscribes to the Press and

[1] Although § 8-3 has been amended by the legislature since the events underlying this case; see, e.g., Public Acts 2021, No. 21-19, § 8; those amendments have no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of the statute.

[2] We granted the commission's petition for certification to appeal, limited to the following issues: (1) "Did the Appellate Court correctly conclude that . . . § 8-3 (d), which requires notices of zoning amendments to be published in a 'newspaper having a substantial circulation in the municipality,' may be satisfied by evidence of the specific number of newspapers physically sold or distributed within that municipality?" And (2) "[d]id the Appellate Court correctly conclude that the ready availability of a newspaper to residents of a municipality within that newspaper's area of coverage, where the newspaper has a history of being used for the municipality's notices, was insufficient to satisfy the 'substantial circulation' requirement of § 8-3 (d)?" *9 Pettipaug, LLC* v. *Planning & Zoning Commission*, 346 Conn. 1021, 1021–22, 293 A.3d 898 (2023).

[3] The plaintiffs, 9 Pettipaug, LLC, and Eniotna, LLP, are business entities that own real property in Fenwick located at 9 and 11 Pettipaug Avenue, respectively. During the pendency of this certified appeal, the named plaintiff, 9 Pettipaug, LLC, sold the property that it owned in Fenwick and stipulates that dismissal of the appeal is appropriate as to it. For the sake of consistency with other filings and opinions in this case, however, we continue to refer to 9 Pettipaug, LLC, and Eniotna, LLP, as the plaintiffs.

9 Pettipaug, LLC *v.* Planning & Zoning Commission

it is not sold anywhere in Fenwick. Given the Press' focus on news items of general interest, its ready availability for purchase in the commercial area of the town of Old Saybrook, in which the borough of Fenwick is located, the fact that the Press' website allows free access to legal notices, and the deference that we afford the commission's long history of using the Press for its legal notices, we conclude that the Press is a newspaper having a substantial circulation in the municipality of Fenwick under § 8-3 (d). Accordingly, we reverse the judgment of the Appellate Court.

The record reveals the following relevant facts and procedural history. Fenwick is a borough located entirely within the boundaries of the town of Old Saybrook. Fenwick has a population of approximately fifty-two persons living in fourteen households year-round; it has an additional sixty-seven homes that serve as summer residences. Because Fenwick's zoning is exclusively residential, it has no stores; the primary commercial area serving Fenwick's residents is Old Saybrook's nearby Boston Post Road.

Residents of eleven of the year-round homes and thirty-five of the seasonal homes, representing 56.8 percent of Fenwick's homes, have served as officials on Fenwick's various boards and commissions. Those governing bodies, including the commission and Fenwick's board of warden and burgesses, zoning board of appeals, tax collector, and historic district commission, have published their various legal notices in the Press for more than thirty years. Monday through Saturday, the Press is available for single copy retail purchase at nine locations, several of which are located in the commercial area on Boston Post Road that serves Fenwick, including gas stations, convenience stores, and a supermarket. Daily circulation of the Press in Old Saybrook as a whole, including home delivery and single copy sales, is twenty-two on weekdays and twenty-

9 Pettipaug, LLC *v.* Planning & Zoning Commission

three on weekends; it is unknown whether any of the single copy sales of the Press were to Fenwick residents. The Press may be viewed online on its website; its online legal notices section may be viewed for free without a subscription. None of Fenwick's fourteen year-round households, however, subscribes to the print or online version of the Press.

Other newspapers are available in Fenwick. At least six households in Fenwick have either print or digital subscriptions to The Hartford Courant, and sixteen households in Fenwick receive a free newspaper published by Shore Publishing, LLC.

On July 20, 2019, the commission adopted certain amendments to Fenwick's zoning regulations to address the short-term rentals of homes in Fenwick by allowing each property owner to rent their premises for up to ten times per year for a minimum of two week intervals. Notice of the commission's decision was published in the Press on July 25, 2019.

On October 25, 2019, the plaintiffs appealed from the decision of the commission to the trial court pursuant to General Statutes § 8-8, claiming, inter alia, that the commission had unlawfully adopted those amendments by failing to post the proposal for public inspection at least ten days prior to the hearing, or by publishing the approval in a newspaper having a substantial circulation in the municipality, in violation of § 8-3. The commission moved to dismiss the zoning appeal and filed a special defense challenging the trial court's jurisdiction, claiming that the appeal was untimely under § 8-8 (b), which requires zoning appeals to be filed in the trial court "within fifteen days from the date that notice of the decision was published as required by the general statutes."

The trial court denied the commission's motion to dismiss, agreeing with the plaintiffs' argument that the appeal was timely filed under the savings provision of

9 Pettipaug, LLC *v.* Planning & Zoning Commission

§ 8-8 (r) because the commission had not published notice of its decision adopting the short-term rental amendment "in a newspaper having a substantial circulation," as required by § 8-3 (d). The trial court took "into account the evidence submitted as it relates to 'circulation,' albeit limited, including not just subscriptions, but individual online sales and access," and found "that the publication did not take place, as required, in a newspaper of substantial circulation. Even if the municipality were defined to include Old Saybrook, the evidence of publication is still insufficient to demonstrate 'substantial circulation.' "

Subsequently, the plaintiffs moved for summary judgment with respect to the sole remaining count of the zoning appeal, which alleged that the commission had unlawfully enacted the short-term rental regulation by failing to publish notice of the amendment in a newspaper having a substantial circulation in Fenwick. The trial court followed its analysis in connection with the motion to dismiss, concluding that the failure to publish the amendment in a newspaper having a substantial circulation in Fenwick rendered it ineffective as a matter of law under § 8-3 (d). See *Wilson* v. *Planning & Zoning Commission*, 260 Conn. 399, 405–406, 796 A.2d 1187 (2002). Accordingly, the court granted the plaintiffs' motion for summary judgment.

Following the granting of certification pursuant to § 8-8 (*o*), the commission appealed from the judgment of the trial court to the Appellate Court, raising numerous arguments in support of its claim that "publication of the amendment to Fenwick's zoning regulations in [the Press] satisfied the 'substantial circulation' requirement of § 8-3 (d)." *9 Pettipaug, LLC* v. *Planning & Zoning Commission*, supra, 217 Conn. App. 722. The Appellate Court followed its decision in *Fisette* v. *DiPietro*, 28 Conn. App. 379, 611 A.2d 417 (1992), and held that, although the statutory scheme did not define the term

9 Pettipaug, LLC *v.* Planning & Zoning Commission

"substantial circulation," its meaning was plain and unambiguous, and informed by "the number of subscriptions or copies sold. The overriding consideration is the extent of dissemination of the publication to readers." *9 Pettipaug, LLC* v. *Planning & Zoning Commission*, supra, 726; see id., 725–26. The Appellate Court emphasized that none of Fenwick's households subscribes to the Press and rejected the commission's reliance on the online availability of the Press on the ground that it "discounts that virtually every newspaper with an accessible online presence could be considered generally available in any municipality with Internet access. 'Substantial circulation,' according to common usage, requires more than general online availability: it requires, for example, substantial dissemination or distribution of printed material among readers and/or substantial distribution of online information to readers. The [trial] court noted that the [commission] did not present any evidence of online viewing numbers of [the Press]." Id., 729–30. Accordingly, the Appellate Court concluded that the trial court correctly had determined that there was no genuine issue of material fact as to whether "publication of the amendment to Fenwick's zoning regulations in [the Press] failed to satisfy the 'substantial circulation' requirement of § 8-3 (d)." Id., 734. The Appellate Court, therefore, affirmed the judgment of the trial court. Id., 737. This certified appeal followed. See footnote 2 of this opinion.

On appeal, the commission claims that the Appellate Court incorrectly concluded that the Press was not a newspaper with a substantial circulation in Fenwick under § 8-3 (d). The commission argues that the Appellate Court improperly deemed the phrase "substantial circulation" to be plain and unambiguous and that its analysis is inconsistent with the purpose of statutory publication requirements, which is to provide constructive notice of the action at issue. The commission argues

9 Pettipaug, LLC *v.* Planning & Zoning Commission

that the term "substantial circulation" means that the newspaper is "readily available" in the municipality; the commission urges us not to focus on subscription numbers given their significant day-to-day variability, along with "the practical impossibility of determining how many municipal residents may receive or access a newspaper *without* subscribing (e.g., at newsstands, libraries, or, today, on the Internet) . . . ." (Emphasis in original.) Relying on case law from other states construing the more commonly used statutory term "general circulation," the commission posits that this case presents a relatively "unusual situation," in which the legislature did not intend the use of different terms to create materially different meanings, and that § 8-3 (d) is "satisfied when the newspaper used is one that is readily available to residents of the municipality and provides coverage of local issues, particularly when the municipality, as here, has a long history of using the same newspaper for its legal notices."

In response, the plaintiffs contend that the commission's interpretation of § 8-3 (d) "effectively seeks to substitute the existing statutory language with its own new standard for notice," which—notwithstanding the seemingly "outdated" nature of the statute—is a change that is exclusively the province of the legislature. Citing the Appellate Court's decision in *Fisette* v. *DiPietro*, supra, 28 Conn. App. 379, and several Superior Court decisions considering the meaning of the term "substantial circulation" or "general circulation," the plaintiffs contend that § 8-3 (d) plainly and unambiguously requires "something more than zero subscriptions in the municipality, zero sales in the municipality, and zero evidence of actual online viewing in the municipality," namely, in Fenwick itself. The plaintiffs further suggest that the commission's reliance on the online availability of the Press leads to absurd and unworkable results because it renders "virtually any newspaper . . . 'available' to Fenwick residents" and ignores the requirement that

9 Pettipaug, LLC *v.* Planning & Zoning Commission

the newspaper be substantially circulated "in the municipality" itself. They argue that Fenwick officials' historical practice of using the Press for publication does not excuse the commission's failure to strictly comply with statutory requirements for notice and publication. We agree with the commission, however, and conclude that the Press is a newspaper having a "substantial circulation" in Fenwick, as that term is used in § 8-3 (d).

It is "well established that the party challenging the validity of a zoning amendment, here, the plaintiff[s], has the burden of proving that the notice requirements were not met." *Roncari Industries, Inc.* v. *Planning & Zoning Commission*, 281 Conn. 66, 77, 912 A.2d 1008 (2007). In the present case, the parties disagree about the meaning of the phrase "a newspaper having a substantial circulation in the municipality" in § 8-3 (d). This raises a question of statutory interpretation governed by General Statutes § 1-2z, over which we exercise plenary review. See, e.g., *Alves* v. *Giegler*, 348 Conn. 364, 377, 306 A.3d 455 (2024). Once we ascertain the meaning of the statute, the application of that standard to the undisputed historical facts in determining whether the town "complied with the statutory requirements is a mixed question of fact and law," over which our review is plenary.[4] *Bridgeport* v. *Plan & Zoning Commission*,

---

[4] We note that the Appellate Court's decision in *Fisette* v. *DiPietro*, supra, 28 Conn. App. 383, states that "[w]hether a newspaper's circulation is substantial is a factual determination that cannot be disturbed unless it is clearly erroneous." That decision then goes on to consider the question of substantial circulation as a legal question, as it considers the facts of that case in the context of the language of the statute and sister state cases. See id., 384; see also id., 384–85 ("[i]n light of this evidence and the commonly accepted usages of the term substantial, we cannot conclude that the trial court's factual determination that the New Britain Herald is a newspaper with [a] substantial circulation in Rocky Hill is either clearly erroneous or contrary to law"). The Appellate Court decided *Fisette* more than thirteen years before this court's decision in *Bridgeport* v. *Plan & Zoning Commission*, 277 Conn. 268, 275, 890 A.2d 540 (2006), which concluded that whether a municipality's notice of a proposed boundary change complied with § 8-3 (a) presented a question of law when the underlying facts were undisputed. This court observed in *Bridgeport* that its conclusion conflicted with Appel-

9 Pettipaug, LLC *v.* Planning & Zoning Commission

277 Conn. 268, 275, 890 A.2d 540 (2006); see *Roncari Industries, Inc.* v. *Planning & Zoning Commission*, supra, 72.

In accordance with § 1-2z, we begin with the statutory text at issue, which provides in relevant part: "Zoning regulations or boundaries or changes therein shall become effective at such time as is fixed by the zoning commission, provided a copy of such regulation, boundary or change shall be filed in the office of the town, city or borough clerk . . . and *notice of the decision of such commission shall have been published in a newspaper having a substantial circulation in the municipality* before such effective date. In any case in which such notice is not published within the fifteen-day period after a decision has been rendered, any applicant or petitioner may provide for the publication of such notice within ten days thereafter." (Emphasis added.) General Statutes § 8-3 (d).

In considering whether the Press is "a newspaper having a substantial circulation in the municipality" of Fenwick, we observe that there is no statutory definition of that phrase. "When a statute does not define a term, General Statutes § 1-1 (a) directs us to use the commonly approved usage of the words at issue. [T]echnical words and phrases, and such as have acquired a peculiar and appropriate meaning in the law, shall be construed and understood accordingly. . . . We may find evidence of such usage, and technical meaning, in dictionary definitions, as well as by reading the statutory language within the context of the broader legislative scheme." (Citation omitted; internal quotation marks omitted.) *Wilton Campus 1691, LLC* v. *Wilton*, 339 Conn. 157, 166, 260 A.3d 464 (2021). With no dictionary

late Court case law, specifically, *Olsen* v. *Planning & Zoning Commission*, 54 Conn. App. 440, 442, 735 A.2d 869 (1999), deciding such compliance issues as questions of fact. See *Bridgeport* v. *Plan & Zoning Commission*, supra, 275 n.5.

9 Pettipaug, LLC *v.* Planning & Zoning Commission

definition of the phrase "substantial circulation," "we must separate its component parts and examine their definitions to gain insight into the meaning of the phrase. Dictionaries in print at the time of the statute's enactment are the most instructive." Id. Nevertheless, although "dictionaries from the time a statute was enacted are often considered the most persuasive . . . later editions also can be instructive, particularly those from the time when a statute is revised but retains the language at issue." (Citation omitted.) Id., 172; see, e.g., *Kuchta* v. *Arisian*, 329 Conn. 530, 537–39, 187 A.3d 408 (2018).

We begin by noting that it is undisputed that the borough of Fenwick is itself the relevant "municipality" for purposes of determining whether the Press is "a newspaper having a substantial circulation in the municipality" for purposes of § 8-3 (d). It is also undisputed that the Press is a "newspaper" for purposes of § 8-3 (d), namely, "a publication . . . containing news, that is, reports of happenings of recent occurrence and of varied character, including political, social, moral, religious, and other subjects of similar nature, local or foreign, and intended for the information of the general reader." (Internal quotation marks omitted.) *Gallacher* v. *Commissioner of Revenue Services*, 221 Conn. 166, 175, 602 A.2d 996 (1992); cf. id., 172, 175–76 (weekly publication known as " 'TV Facts' " was not "a newspaper" exempt from Connecticut use tax because it contained primarily television listings and advertisements, rather than news or opinion pieces). Thus, we are left to determine how to assess whether the Press is a newspaper with a "substantial circulation" in Fenwick.[5]

---

[5] Given that the parties agree that "substantial circulation" must be measured relative to the borough of Fenwick, we leave for another day whether the "in the municipality" language of § 8-3 (d) can accommodate a more regional approach to this issue. Because the Press is a printed publication, we also leave for another day whether an online only newspaper is in fact a "newspaper" within the meaning of § 8-3 (d). See footnote 14 of this opinion.

9 Pettipaug, LLC *v.* Planning & Zoning Commission

The phrase "substantial circulation" has been a part of § 8-3 (d) and its predecessor provisions since the enactment of the statute in chapter 242 of the Public Acts of 1925, later codified at General Statutes (1930 Rev.) § 425. See *Howe* v. *Zoning Commission*, 13 Conn. Supp. 330, 334 (C.P. 1945). Contemporary dictionaries defined the term "circulation" as the "[a]ct of passing from place to place or from person to person, or the extent to which this takes place; dissemination or distribution, or the measure of it, as a book, or a periodical." Webster's Collegiate Dictionary (3d Ed. 1922) p. 182; see The Universal Dictionary of the English Language (1932) p. 185 (defining "circulation" as "[the] process of passing, being handed, or transmitted, from one person to another; of being sent from place to place (of material and nonmaterial things)"). "Substantial" is defined as "[c]onsiderable: large"; Webster's Collegiate Dictionary, supra, p. 958; or, similarly, as "[c]onsiderable, weighty, important . . . ." The Universal Dictionary of the English Language, supra, p. 1209.

More modern dictionaries define these terms consistently, including dictionaries contemporary to amendments to the provision currently codified at § 8-3 (d) in 1965, 1977, and 1989.[6] See, e.g., Webster's Third New International Dictionary (1976) p. 409 (defining "circulation" as "popular dissemination" or "the act of circulating or being circulated"); id. (defining "circulate" as "to come into the hands of readers . . . to become sold or distributed"); id., p. 2280 (defining "substantial" as "considerable in amount, value, or worth"); see also,

_____

[6] Public Acts 1965, No. 622, § 1, amended the statute to require that a copy of the zoning regulations, boundaries, or changes in the case of a district be filed with both the district and the town clerk and specified that notice of the commission's decision, rather than the filing of the regulation, boundary, or change, be published. Public Acts 1977, No. 77-509, § 2, divided § 8-3 into subsections. Public Acts 1989, No. 89-356, § 10, authorized the applicant or petition to provide for publication within ten days after the failure of the commission to publish notice of the decision within fifteen days.

9 Pettipaug, LLC *v.* Planning & Zoning Commission

e.g., The American Heritage College Dictionary (4th Ed. 2004) p. 261 (defining "circulation" as "[the] [d]issemination of printed material among readers" or "[t]he number of copies of a publication sold or distributed"); The American Heritage College Dictionary, supra, p. 1376 (defining "substantial" as "[c]onsiderable in importance, value, degree, amount, or extent").

Viewed in context, we conclude that the phrase "a substantial circulation in the municipality" is ambiguous. The lack of guidance as to how to measure the requisite circulation gives rise to multiple, reasonable interpretations. See, e.g., *Ledyard* v. *WMS Gaming, Inc.*, 338 Conn. 687, 698, 258 A.3d 1268 (2021). "Accordingly, we now consider extratextual sources, including legislative history and similar statutes, to determine the scope" of the term, as applied in this context. Id., 699. Unfortunately, the legislative history does not shed light on the meaning of the statute because the language at issue was enacted prior to the recording of legislative history, and subsequent revisions have not considered the meaning of the term in § 8-3 (d). But see footnote 12 of this opinion.

Our previous case law, however, helps illuminate the purpose of the newspaper notice required under § 8-3 (d). See, e.g., *Edward Balf Co.* v. *East Granby*, 152 Conn. 319, 325, 207 A.2d 58 (1965). The purpose of newspaper publication is to provide constructive notice that will notify "as much of the population as possible of contemplated zoning actions," with "subsequent action by the zoning commission or board . . . held invalid if the constructive notice given to the public was inadequate. . . . This was true even when the complaining party appeared at the public hearing [because] the legislative intent to notify the public constructively would otherwise be frustrated." (Citations omitted.) *Schwartz* v. *Hamden*, 168 Conn. 8, 14–15, 357 A.2d 488 (1975); cf. *Timber Trails Corp.* v. *Planning & Zoning Commis-*

9 Pettipaug, LLC *v.* Planning & Zoning Commission

*sion*, 222 Conn. 374, 378–79, 610 A.2d 617 (1992) (actual notice, as demonstrated by plaintiffs' active participation at hearing on proposed zone change, did not satisfy public filing requirements of § 8-3 (a), "[t]he evident purpose of [which], to notify *all* interested persons of the precise character of the proposed change, would be thwarted if the presence of *some* interested persons at the public hearing could serve as an acceptable substitute for compliance with the statutory requirement" (emphasis in original)). "In the absence of newspaper publication, unknown individuals with an interest in zoning matters would have no way of learning what zoning decisions were being contemplated." *Lauer* v. *Zoning Commission*, 220 Conn. 455, 462, 600 A.2d 310 (1991). "The law is clear that failure to give proper notice of a hearing constitutes a jurisdictional defect, results in a lack of due process, and renders the action of the commission granting the zone change null and void." *Jarvis Acres, Inc.* v. *Zoning Commission*, 163 Conn. 41, 44, 301 A.2d 244 (1972).

This court's leading decision on the subject of § 8-3 is *Jarvis Acres, Inc.* v. *Zoning Commission*, supra, 163 Conn. 41. In *Jarvis Acres, Inc.*, this court considered whether the East Hartford zoning commission had complied with the statute by publishing notice of a hearing considering a zone change in two different newspapers, namely, The Hartford Courant and the East Hartford Gazette. See id., 43–45. Observing that the timeliness of the notices, the adequacy of their content, and whether the two newspapers had "a substantial circulation in East Hartford" were undisputed; id., 45; the court held that § 8-3 did not require that both advertisements be published in the same newspaper. Id., 45–48. This court could "not see how the legislative purpose could be frustrated by the publication of the notice in two different newspapers rather than twice in the same newspaper. To the contrary, the legislative purpose would be

9 Pettipaug, LLC *v.* Planning & Zoning Commission

enhanced in that it is logical to assume that the former manner of publication would reach more of the populace than the latter. In addition, if the intent of the legislature were . . . that notice must be published twice in the 'same' newspaper, it could easily have said so." Id., 48. This court considered it "convincingly clear that the legislative intent is simply that on each occasion on which the notice is published that it be published in a newspaper having a substantial circulation in the municipality." Id.

Despite its ubiquity across Connecticut's various statutory schemes,[7] there is not much case law concerning the meaning of the term "substantial circulation." The only appellate decision on point is the Appellate Court's decision in *Fisette* v. *DiPietro*, supra, 28 Conn. App. 379, which considered whether Rocky Hill's zoning commission had complied with the "substantial circulation" requirement of § 8-3 (a) in publishing notice of a proposed zone change in the New Britain Herald. See id., 383–85. Noting that "what constitutes substantial circulation" was a question of first impression, the Appellate Court then concluded that the scope of "substantial circulation" is "relative" to the population of

---

[7] As the commission and the amicus curiae the Connecticut Conference of Municipalities note, there are more than eighty Connecticut statutes that require notice by publication in a "newspaper having substantial circulation." See, e.g., General Statutes § 7-131n (municipality's notice of public hearing before taking of land that was previously intended for use as park, open space or recreation purposes); General Statutes § 7-147b (e) (notice of hearing on establishment of proposed historic district); General Statutes § 8-3 (f) (1) (applicant's notice of certification that building, use or structure conforms with applicable regulations in connection with issuance of building permit or certificate of occupancy); General Statutes § 8-7 (notice of decision by zoning board of appeals); General Statutes § 10-289e (notice of public hearing and referendum vote on issuance of municipal bonds to finance school building project for private academy); General Statutes § 19a-639a (b) and (f) (2) (notices of application for and hearing on certificate of need in connection with health systems planning unit); General Statutes § 22a-349a (b) (notice of issuance, revocation, suspension, or modification of permit for minor activity by Commissioner of Energy and Environmental Protection).

9 Pettipaug, LLC *v.* Planning & Zoning Commission

the municipality at issue, with the word " 'substantial' " defined as "something 'considerable' or 'ample,' " or " 'considerable in amount, value, or worth.' " Id., 384. The Appellate Court held that the trial court had not committed clear or legal error[8] in finding that the New Britain Herald had a substantial circulation in Rocky Hill because it was "circulated to 16 percent of the occupied households in Rocky Hill" and because it "indexe[d] Rocky Hill news on its front page, report[ed] the news of town government meetings in the Rocky Hill news sections, and print[ed] public notices on the same page."[9] Id.; see id., 385.

The Appellate Court's decision in *Fisette* is, however, of minimal guidance in the present case, which involves a much smaller municipality than Rocky Hill and arises three decades later, at a time when the print journalism

[8] The Appellate Court's decision in *Fisette* appeared to consider "substantial circulation" to be a question of fact subject to the clearly erroneous standard of review but also analyzed the issue as a legal question. See *Fisette* v. *DiPietro*, supra, 28 Conn. App. 382–85. The Appellate Court's use of the clearly erroneous standard of review in the posture of *Fisette* is inconsistent with subsequent decisions of this court treating similar determinations as questions of law when they arise in the context of undisputed facts. See footnote 4 of this opinion and accompanying text.

[9] As the plaintiffs argue, some Superior Court decisions have engaged in similar mathematical calculations in considering whether a newspaper is one of general circulation. See, e.g., *Oates* v. *Inland Wetlands & Watercourses Commission*, Superior Court, judicial district of Middlesex, Docket No. CV-08-4009226 (December 19, 2008) (46 Conn. L. Rptr. 789, 791) (Regional Standard, with 274 subscribers in town of 3174 households, or 8.6 percent of households, is "a newspaper having a 'general circulation' " under General Statutes § 22a-42a (d) (1)); *Sorrow* v. *Zacchera*, Superior Court, judicial district of Hartford, Docket No. CV-98-0580072-S (December 23, 1998) (24 Conn. L. Rptr. 19, 21) (Valley News, with 147 sales and subscriptions in Canton, which had population of 8453 among 3444 households, was "not substantial" but also "not de [minimis]," rendering it "a newspaper of general circulation" under § 8-3 (g)); see also *Jacobson* v. *Zoning Board of Appeals*, Docket No. CV-08-4007857S, 2010 WL 2574101, *3 (Conn. Super. May 21, 2010) (concluding that free newspaper, Voices Weekender, is "a newspaper having a general circulation in the [t]own of Washington," as required by General Statutes § 8-7d, because it is mailed to every residence in town, thus satisfying constructive notice regardless of lack of any "way to determine whether people are actually reading it").

9 Pettipaug, LLC *v.* Planning & Zoning Commission

industry has been drastically reshaped by the growth of the Internet. See, e.g., L. Rieders, Note, "Old Principles, New Technology, and the Future of Notice in Newspapers," 38 Hofstra L. Rev. 1009, 1028–30 (2010). Nor is case law from other states particularly helpful on the precise meaning of the term "substantial circulation" in the Internet age. Our research has revealed only one other state, California, that uses that term in describing whether a newspaper is one that qualifies for publication of legal notices, and it does so with the significant condition that the "substantial distribution" be "to paid subscribers . . . ."[10] Cal. Government Code § 6008 (a)

_____

[10] Section 6008 of the California Government Code uses the term "substantial distribution" in defining more specifically the term "newspaper of general circulation." See Cal. Government Code § 6008 (a) (Deering Supp. 2024). It is an alternative to § 6000 of the California Government Code, which does not contain a paid subscriber requirement but requires, among other things, that the qualifying newspaper be printed in the city at issue. See Cal. Government Code § 6000 (Deering 2010); see also *In re San Diego Commerce*, 40 Cal. App. 4th 1229, 1234–37, 47 Cal. Rptr. 2d 303 (1995) (declining to imply "substantial distribution" requirement into § 6000, which requires that newspaper be printed in municipal jurisdiction at issue to qualify as one of "general circulation"), review denied, California Supreme Court (February 22, 1996). Section 6008 clearly requires such a newspaper, in addition to being one disseminating "local or telegraphic news and intelligence of a general character" with "a bona fide subscription list of paying subscribers"; Cal. Government Code § 6008 (a) (1) (Deering Supp. 2024); to also have, among other things, "a substantial distribution to paid subscribers in the city, district, or public notice district for which it is seeking adjudication." Cal. Government Code § 6008 (a) (2) (Deering Supp. 2024). California courts have concluded that this statutory language plainly and unambiguously excludes newsstand sales from the "substantial distribution" inquiry. See *Medeiros* v. *South Coast Newspapers*, 7 Cal. App. 4th 982, 986, 9 Cal. Rptr. 2d 291 (1992); see id., 986–87 ("Given the legislative concern that the persons who are to receive legal notices be likely to read the newspapers publishing those notices," the court concluded that, "[s]tanding alone, [the ratio of paying subscribers to town inhabitants of] 1.48 percent is too small a number to be declared to be substantial . . . . [N]or [could the court] say definitively that it is insubstantial because there is little to which it can be compared," and, accordingly, the court remanded the case for an evidentiary hearing, because "it may be substantial if other newspapers in the area have similar percentages of the population as paid subscribers."); *In re Carson Bulletin*, 85 Cal. App. 3d 785, 795, 149 Cal. Rptr. 764 (1978) (newspaper with twelve paid subscribers "in a city of 79,000 persons," which is ratio

9 Pettipaug, LLC *v.* Planning & Zoning Commission

(2) (Deering Supp. 2024). The overwhelming majority of other states use variants of the phrase "newspaper of general circulation," which is a phrase that also appears in numerous Connecticut statutes, including other subsections of § 8-3.[11] See, e.g., General Statutes 8-3 (g) (1) (zoning commission's notice of approval or denial of site plans).

The plaintiffs argue that this difference in the various subsections of § 8-3 triggers the maxim "that there is a purpose behind every sentence, clause, or phrase used in an act and that no part of a statute is superfluous," and the presumption that "[t]he use of the different terms . . . within the same statute suggests that the

---

of 0.02 percent of local population, is not one of " 'substantial distribution to paid subscribers' " as matter of law). Case law applying this California statute is not instructive because its qualifying term, "to paid subscribers," provides far more legislative direction than does our more generally phrased statute, the generality of which provides municipalities with far more discretion in their choice of a newspaper that satisfies their statutory obligations with respect to providing constructive notice of zoning matters.

[11] Well more than 100 Connecticut statutes require the issuance of various notices in a newspaper having a "general circulation." See, e.g., General Statutes § 8-56a (notice of public hearing prior to construction of public housing project subject to standards of United States Department of Housing and Urban Development); General Statutes § 8-127 (b) and (c) (2) (notices of public hearing on and approval of redevelopment plan); General Statutes § 8-169e (c) (public hearing on municipality's acquisition of property pursuant to community development plan); General Statutes § 9-395 (a) (public notice of primary election for municipal office and endorsed candidates); General Statutes § 9-433 (a) (public notice of primary election for state or district office); General Statutes § 12-157 (a) (notice of sale of real estate for unpaid taxes); General Statutes § 19a-131a (c) (governor's declaration of public health emergency); General Statutes (Supp. 2024) § 22a-20a (b) (4) (notice of informal public meeting in connection with placement or expansion of "affecting facilities" in environmental justice communities); General Statutes § 22a-109 (f) (zoning commission's action on coastal site plan review); General Statutes § 42-164 (a) (sale of personal property contained in unpaid rental unit at self-service storage facility); General Statutes § 45a-609 (b) (notice by publication of application for removal of parent or guardian whose "whereabouts . . . are unknown"); General Statutes § 45a-716 (c) (notice by publication of petition to terminate parental rights when personal service cannot "be reasonably effected within the state" or person is located "out of the state").

9 Pettipaug, LLC *v.* Planning & Zoning Commission

legislature acted with complete awareness of their different meanings . . . and that it intended the terms to have different meanings . . . .'' (Internal quotation marks omitted.) *Felician Sisters of St. Francis of Connecticut, Inc.* v. *Historic District Commission*, 284 Conn. 838, 849–50, 937 A.2d 39 (2008); see, e.g., *Seramonte Associates, LLC* v. *Hamden*, 345 Conn. 76, 86–87, 282 A.3d 1253 (2022). Indeed, the Appellate Court's decision in this case relied on this rule of construction in concluding that the word ''substantial'' is quantitative in nature. See *9 Pettipaug, LLC* v. *Planning & Zoning Commission*, supra, 217 Conn. App. 727.

Although this presumption is a valuable interpretive guide, the legislature's use of two different terms in a statute does not necessarily mean that they have a different meaning. This principle is ''a general rule''; *State* v. *Bell*, 283 Conn. 748, 798, 931 A.2d 198 (2007); that is not inexorable. See *Dept. of Public Safety* v. *Freedom of Information Commission*, 298 Conn. 703, 733–37, 6 A.3d 763 (2010) (rejecting reliance on presumption and holding that terms '' 'registration information' '' and '' 'registry information' '' are synonymous as used in General Statutes §§ 54-255 and 54-258 (a) (4) governing dissemination of information with respect to certain sex offenders). As the Michigan Supreme Court stated, we do not apply this ''general rule'' when doing so would ''[constitute] a failure to give meaning to the statute in its entirety and in its overall context.'' (Internal quotation marks omitted.) *Honigman Miller Schwartz & Cohn LLP* v. *Detroit*, 505 Mich. 284, 318, 952 N.W.2d 358 (2020); see id. (concluding that, ''despite the [l]egislature's use of the distinctive terms 'performed' and 'rendered' . . . [those] terms should be understood as having *similar* meanings within [a city income tax] statute'' (emphasis in original)). Observing that that ''same proposition was most likely applied to cases decided last month and will most likely be applied

9 Pettipaug, LLC *v.* Planning & Zoning Commission

to cases decided next month," the Michigan court emphasized that its "inapplicability . . . is merely illustrative that there are sometimes competing interpretative propositions that must be balanced and harmonized in order for the [l]egislature's genuine intentions to be faithfully discerned." Id., 321.

Thus, we continue to recognize that "the legislature is always presumed to have created a harmonious and consistent body of law . . . . [T]his tenet of statutory construction . . . requires [this court] to read statutes together when they relate to the same subject matter . . . . Accordingly, [i]n determining the meaning of a statute . . . we look not only at the provision at issue, but also to the broader statutory scheme to ensure the coherency of our construction." (Internal quotation marks omitted.) *Felician Sisters of St. Francis of Connecticut, Inc.* v. *Historic District Commission*, supra, 284 Conn. 850. This is particularly so given the presence of General Statutes § 1-2, which is a provision of general applicability that provides: "Each provision of the general statutes, the special acts or the charter of any town, city or borough which requires the insertion of an advertisement of a legal notice in a daily newspaper shall be construed to permit such advertisement to be inserted in a weekly newspaper; but this section shall not be construed to reduce or otherwise affect the time required by law for giving such notice. Whenever notice of any action or other proceeding is required to be given by publication *in a newspaper,* either by statute or order of court, *the newspaper selected for that purpose, unless otherwise expressly prescribed, shall be one having a substantial circulation* in the town in which at least one of the parties, for whose benefit such notice is given, resides." (Emphasis added.) The broad applicability of § 1-2 suggests that the meanings of the terms "general circulation" and "substantial circulation" must be harmonized for the statutory scheme to have coherency, especially because several of the provisions requir-

9 Pettipaug, LLC *v.* Planning & Zoning Commission

ing "general circulation" affect constitutionally protected interests, such as notice of a proceeding to terminate parental rights; see General Statutes § 45a-716 (c); and notice of a primary election; see General Statutes § 9-395 (a); along with more pedestrian matters, such as land use applications.[12] See footnote 11 of this opinion.

---

[12] There is some legislative history concerning other subsections of § 8-3 indicating that, when the legislature amended those provisions, it did not see any significant difference in meaning between "general circulation" and "substantial circulation." Specifically, in 1982, the legislature enacted No. 82-90 of the 1982 Public Acts to amend § 8-3 (g), which concerns the publication of commission decisions on site plan applications. See, e.g., *Sorrow* v. *Zacchera*, Superior Court, judicial district of Hartford, Docket No. CV-98-0580072-S (December 23, 1998) (24 Conn. L. Rptr. 19, 19–20, 25 n.4). Among other changes to § 8-3 (g), the legislature required that decisions approving or denying site plan applications be published "in a newspaper having a general circulation in the municipality." Public Acts 1982, No. 82-90. The legislative history of the provision indicates that the original draft of the amendment required that the circulation be in a newspaper with a " 'substantial' " circulation. 25 H.R. Proc., Pt. 5, 1982 Sess., p. 1581, remarks of Representative Robert F. Frankel. During House debate on the bill, Representative R. E. Van Norstrand raised a question about "the difference between [the meanings of] substantial and general," to which the bill's sponsor, Representative Joseph J. Farricielli, replied that the Legislative Commissioners' Office had reported that "the word 'substantial' is used some [thirty-seven] times in the statutes and the word 'general' is used some [ninety-eight] times" and ultimately had concluded that "there was not a great difference but that it probably would be a good idea for the committee to consider standardizing in one form or another all of the references in the statutes." Id., pp. 1586–87. Representative Farricielli reported further that he believed an overall standardization would be a project better suited for future bills but accepted the suggestion to use the word "general" because the same statute already used that word, which proponents of the bill believed "would be protecting some of the advertisements and some of the small local papers." Id., p. 1587. Although Representative Farricielli remarked that he personally did not "know the difference" between the two terms in that context, Representative Van Norstrand responded that he viewed the word "substantial [to connote] . . . something measurable perhaps in the circulation of newspapers versus total newspapers circulated in the community. General doesn't tell me a heck of a thing. I don't know what that means." Id., p. 1588.

Beyond this change to § 8-3, there is more recent evidence that the legislature remains aware of this potential distinction and the apparent desirability of standardization. Number 22-70, § 5, of the 2022 Public Acts amended General Statutes § 42-164, which governs the sale of personal property contained in rental storage units at self-service storage facilities for which the rent had not been paid, to, among other things, provide for the publication of the notice of the sale "in any print or online newspaper *of general*

9 Pettipaug, LLC *v.* Planning & Zoning Commission

With this point in mind, we observe that the phrase "newspaper of general circulation" is a long established legal term of art that informs our construction of § 8-3 (d) by focusing on characteristics that are not strictly quantitative in nature. According to Black's Law Dictionary, it is well established that "[a] 'newspaper of general circulation' is a publication that 'contains news and information of interest to the general public, rather than to a particular segment, *and that is available to the public within a certain geographic area.*' . . . The newspaper need only contain some news of general character and *interest to the community*, even though the newspaper may also be of particular interest to a specific class of individuals." (Citation omitted; emphasis altered.) *Postville* v. *Upper Explorerland Regional Planning Commission*, 834 N.W.2d 1, 10–11 (Iowa

*circulation* in the municipality where the self-service storage facility is located or on any publicly accessible, independent Internet web site that regularly conducts online auctions of personal property." (Emphasis added.) Previously, the statute had required such notice to be published "in a newspaper of *substantial circulation* in the municipality where the self-service storage facility is located." General Statutes (Rev. to 2021) § 42-164 (a). The legislative history of that public act is silent as to the reason for the change from "substantial" to "general" circulation, although the proponents of the bill viewed the addition of an online, independent auction website option as a way to protect the unit renters by maximizing the number of interested bidders, rather than as a means of providing notice, given the actual notice provisions of the statute. See Conn. Joint Standing Committee Hearings, General Law, Pt. 1, 2022 Sess., pp. 123–24, 194, remarks and written testimony of Joseph Doherty, chief legal and legislative officer for the Self Storage Association; see id., p. 194, written testimony of Doherty. Indeed, the act's proponent, Doherty, specifically described newspaper notice in print or online publications as not "an effective way to reach people," a point with which at least one legislator, Representative Michael D'Agostino, agreed. Id., p. 122.

Finally, we note that the Appellate Court was presented with a claim predicated on the possible distinction between "general" and "substantial" circulation but declined to consider it on preservation grounds. See *In re Ariana S.*, 159 Conn. App. 513, 525 n.10, 123 A.3d 463 (2015) (declining to consider whether General Statutes § 45a-716 (c), which requires notice of termination of parental rights action to be published "in a newspaper of general circulation in the place of the last-known address of the person to be notified," also requires that newspaper to one be of "substantial circulation" given provisions of § 1-2).

9 Pettipaug, LLC *v.* Planning & Zoning Commission

2013), quoting Black's Law Dictionary (9th Ed. 2009) p. 1141; see also *C.S.* v. *J.B.*, 305 So. 3d 243, 250 (Ala. Civ. App. 2020) (nothing, with respect to court rule governing service by publication, that "using the term 'newspaper of general circulation' . . . mean[s] that the newspaper in which a notice must appear is a newspaper that is read by the general public and that presents newsworthy articles relating to affairs of interest to the general public"); *St. Mary's* v. *St. Mary's Native Corp.*, 9 P.3d 1002, 1011 (Alaska 2000) ("a newspaper is one of 'general circulation' in a community when it 'contains news of general interest to the community and reaches a diverse readership' "); *Wahl* v. *Hart*, 85 Ariz. 85, 86–87, 332 P.2d 195 (1958) (county's "official newspaper" was newspaper of general circulation when it was "a publication devoted to the dissemination of news on a variety of topics of interest to the general reader, but giving special prominence to legal news"); *Corpus Christi* v. *Jones*, 144 S.W.2d 388, 393 (Tex. Civ. App. 1940, writ dism'd) (citing authorities); *Joint School District No. 1* v. *Joint County School Committee*, 26 Wis. 2d 580, 584, 133 N.W.2d 317 (1965) ("Decisions in other jurisdictions indicate . . . that whether or not general circulation exists hinges not [on] the *number* of people who receive the newspaper, but rather [on] whether the news coverage is directed to the interests of a particular *class* of people. A paper containing general news [that] is available to the public at large is ordinarily considered to be one of general circulation." (Emphasis in original; footnote omitted.)). Put differently, "[t]o have a content that appeals to the public generally, the newspaper should contain items of general interest. Although a newspaper may be primarily directed to a particular locality or group, it must nevertheless contain some items of interest to persons who do not live in that locality or who are not members of that group. These items of general interest may include national, state, or

349 Conn. 268 JUNE, 2024 293

9 Pettipaug, LLC *v.* Planning & Zoning Commission

county news; editorials; human interest stories; and advice columns, among others. The possibilities are endless.'' *Great Southern Media, Inc.* v. *McDowell County*, 304 N.C. 427, 441–42, 284 S.E.2d 457 (1981).

Of course, ''the term 'general circulation' in itself is not devoid of quantitative aspects . . . .'' Id., 442; see id., 440–42 (distinguishing North Carolina statute, which requires ''a '*general circulation* to [actual] paid subscribers,' '' from California statute requiring '' 'a *substantial distribution* to paid subscribers' '' in holding that ''the newspaper must enjoy more than a de minimis number of readers in the'' relevant geographical area to satisfy paid subscribers element (emphasis in original)); see also *Moore* v. *State*, 553 P.2d 8, 21 (Alaska 1976) (''[t]he proper construction of the term 'general circulation' requires consideration of both the qualitative and quantitative aspects of the publication''). Indeed, the definitions of the word ''general'' in dictionaries contemporaneous to the enactment of § 8-3 (d) confirm that it has a quantitative component consistent with the word ''substantial.'' Compare Webster's Collegiate Dictionary, supra, p. 417 (defining ''general'' as ''[c]*ommon to many; prevalent*; extensive, though not universal'' (emphasis added)),with id., p. 958 (defining ''substantial'' as ''[c]onsiderable: large'').

Particularly given the absence of any statutory guideposts to narrow the inquiry into whether a given newspaper has the requisite level of circulation, such as a minimum number of subscribers or a prescribed ratio of subscribers to the population of the target location,[13]

---

[13] For example, North Carolina's newspaper notice statute requires that the ''general circulation'' be ''to actual paid subscribers . . . .'' N.C. Gen. Stat. § 1-597 (a) (2023). In construing this statute, the North Carolina Supreme Court cited to examples of statutes that are even ''more specific in terms of paid circulation requirements than [those of North Carolina]. Kentucky requires that the newspaper 'have the largest bona fide circulation in the publication area' and be 'paid for by not less than fifty per cent (50%) of those to whom distribution is made.' In addition, it must be 'circulated generally in the area.' Ky. Rev. Stat. § 424.120 (1) (b) (1970) (several addi-

9 Pettipaug, LLC *v.* Planning & Zoning Commission

we view the appropriate inquiry as focusing primarily on the type of news covered by the publication and its general availability in the municipality. See *Wahl* v. *Hart*, supra, 85 Ariz. 87 ("we assume . . . that [when] the statute requires circulation within a particular area, the aim is for the contents of the notice to be brought home to that portion of the general public within that area"). To engage in a rigidly mathematical inquiry that is narrowly focused on subscriber numbers—akin to that undertaken by the Appellate Court in *Fisette* v. *DiPietro*, supra, 28 Conn. App. 384–85—would be to restrict the inquiry in a way that the legislature did not intend. See *Great Southern Media, Inc.* v. *McDowell County*, supra, 304 N.C. 442 (The court concluded that the North Carolina statute requiring a general circulation to "actual paid subscribers" requires circulation to more than a de minimis number of paid subscribers relative to the size of community, but it emphasized that the statute "mandates no minimum number of paid subscribers and requires no minimum ratio of paid subscribers to population. To impose such minimums would be to require something more than specified by the statute."); id., 442 n.8 (declining to consider "free distribution and sales from newsstands and vending racks" given statutory requirement of sales to " 'actual paid subscribers' "); see also *Postville* v. *Upper Explor-*

---

tional requirements specified). Wisconsin requires that a newspaper be published in the relevant city or town, have a bona fide paid circulation that constitutes at least 50 percent of its circulation, and have actual subscribers to 1000 copies in '1st [and] 2d class' cities or 300 copies in '3rd and 4th class' cities. [Wis.] Stat. Ann. § 985.03 (West 1981). Idaho and Minnesota also have a statutory minimum number of paid subscribers required to qualify as a newspaper for printing legal notices. See Idaho Code § 60-106 (1976) (200 bona fide subscribers living in the county); Minn. Stat. § 331.02 (4) (West 1981) (500 subscribers or free circulation to 500 required)." *Great Southern Media, Inc.* v. *McDowell County*, supra, 304 N.C. 441; see also *Sunland Publishing Co., Inc.* v. *Jackson*, 710 So. 2d 879, 882 (Miss. 1998) (discussing Miss. Code Ann. § 13-3-31 (Supp. 1996), under which " 'general circulation' means numerically substantial, geographically widespread, demographically diversified circulation to bona fide paying subscribers").

349 Conn. 268 JUNE, 2024 295

9 Pettipaug, LLC *v.* Planning & Zoning Commission

*erland Regional Planning Commission*, supra, 834
N.W.2d 11 (rejecting ''[t]he numbers argument'' that
lack of subscriptions in two of five Iowa counties served
by planning commission rendered newspaper not one
of ''general circulation'' because that status ''is not
determined by the number of its subscribers, but by its
diversity''); *Joint School District No. 1* v. *Joint County
School Committee*, supra, 26 Wis. 2d 584–85 (observing
that ''the circulation of a particular number of papers
in the school district is unnecessary to make the news-
paper in question a legal medium for the publication
of the notice'' and concluding that, because ''[the] appel-
lant's attack on the presumption was based solely on
limited circulation grounds and not on the grounds that
the [newspaper] did not appeal to the public at large,
it must fail''). But see *Wahl* v. *Hart*, supra, 85 Ariz. 86–87
(concluding that ''the [county's] duly designated official
newspaper'' was not one of general circulation within
boundaries of proposed district at issue because it was
delivered only by mail or subscription, ''[t]here were
no subscribers within the boundaries of the proposed
district at the time of the hearing by the'' county's board
of supervisors, and ''no evidence was offered [that]
tended to establish that [the newspaper] actually passed
into the hands of such residents'').

Although subscription numbers may well furnish rele-
vant evidence of a newspaper's availability and cover-
age of matters of local interest within a jurisdiction,
we agree with the Alaska Supreme Court that exclusive
reliance on ''a statistical analysis for [this] issue . . .
[is] most inappropriate because size of readership is
only one factor [that] must be considered in determining
whether a particular newspaper is one of general circu-
lation.'' *Moore* v. *State*, supra, 553 P.2d 22 n.21; see id.,
21–22 (observing that ''[t]he circulation of the Anchor-
age Times'' to 130 subscribers in outlying city with
population of 3500 ''was not so insignificant that the

newspaper would fail to reach a diverse group of people in the community''); see also *St. Mary's* v. *St. Mary's Native Corp.*, supra, 9 P.3d 1012 (rejecting interpretation of *Moore* as ''setting a threshold ratio of the number of papers to the number of residents required to establish that a newspaper is one of general circulation''). Instead, ''[w]hen determining whether the newspaper has a sufficiently broad circulation within the [applicable] region, the ultimate consideration is whether publication in that newspaper fulfills the purpose underlying [the] statute and other similar provisions—to give notice to the general public.'' *Postville* v. *Upper Explorerland Regional Planning Commission*, supra, 834 N.W.2d 11.

We also recognize that the selection of a newspaper for publication of legal notices is often influenced by a variety of considerations—including cost—and that courts should afford considerable deference to the decisions of municipal governments in this respect. See, e.g., *St. Mary's* v. *St. Mary's Native Corp.*, supra, 9 P.3d 1012. The municipality's decision is often ''one of economics'' that ''must be left to the wisdom or soundness of the municipality.'' *Sunland Publishing Co.* v. *Jackson*, 710 So. 2d 879, 884 (Miss. 1998). As this court observed nearly two centuries ago, municipal governments, which ''make the by-law[s] . . . [and the] inhabitants [of which] are to be subject to its provisions . . . are presumed to be most competent to determine . . . which mode of publication will best subserve the purpose of general information.'' *Higley* v. *Bunce*, 10 Conn. 435, 442 (1835).

Thus, in considering whether a chosen newspaper is one of ''substantial'' or ''general'' circulation ''in the municipality,'' we first consider whether it is a publication that contains general news content of local interest to the applicable community. We agree with the amici curiae the Connecticut Chapter of the American Plan-

349 Conn. 268 JUNE, 2024 297

9 Pettipaug, LLC *v.* Planning & Zoning Commission

ning Association and the Connecticut Association of Zoning Enforcement Officials (associations) that we then consider the newspaper's availability to the community, as shown by (1) "where and how [it] is distributed," (2) the frequency of distribution, (3) the existence of "any cost barriers to access," (4) "whether it is consistently used for such notices and for how long," and (5) whether residents are aware of its use for the publication of legal notices. We agree with the commission and the associations that this availability centered test provides municipalities with greater certainty in their choice of newspapers—particularly in smaller communities—than one that more rigidly considers factors such as "local subscriptions, sales, and views," the mutability of which renders them "burdensome and, in some cases, impractical for zoning officials to measure on a continuing basis." Although the legislature is certainly best equipped to make public policy determinations that would further adapt municipalities' notice obligations to twenty-first century technologies and changes in the newspaper industry; see, e.g., *Raftopol* v. *Ramey,* 299 Conn. 681, 684–85, 12 A.3d 783 (2011); we believe that this availability centered test best effectuates the legislature's original intent of providing constructive notice to the residents of a municipality in a time of great change in print journalism.[14]

---

[14] Citing Judge Guido Calabresi's descriptions of the problems of "legislative inertia" in the face of "legal obsolescence," the amicus curiae the Connecticut Conference of Municipalities (conference) asks us to "interpret § 8-3 (d) and other municipal notice statutes in a way that brings them in line with the realities of contemporary society and recognize that publication to a municipal website satisfies municipal notice requirements." See G. Calabresi, A Common Law for the Age of Statutes (1982) pp. 125–26. Publication to a municipality's own website might well be the most cost-effective and efficacious way to provide constructive notice of the actions of local governments, particularly in a time when the businesses of local journalism and printed newspapers are undergoing a time of great change resulting from the prevalence of online news sources and reduced subscription and advertisement revenue. See, e.g., L. Rieders, supra, 38 Hofstra L. Rev. 1028–29. Nevertheless, and as the conference recognizes, it is for the legislature to decide as a matter of public policy whether to eliminate the long-standing

9 Pettipaug, LLC *v.* Planning & Zoning Commission

Accordingly, we turn to the record in this case. We observe that there is no claim that the local news content of the Press is not of general interest to the residents of Fenwick.[15] The Press is readily available in Fenwick because it is available for retail purchase at nine locations along Boston Post Road in Old Saybrook, which is the commercial area that serves Fenwick, rendering it as accessible to residents of Fenwick as any other newspaper. Further, the content of the Press is readily accessible online, and its public notices in particular are available at no charge to the viewer. Finally, as the commission argues, Fenwick's various governing bodies have used the Press for public notices for decades, and residents of most of Fenwick's homes have served on those governing bodies. Thus, the use

requirement of newspaper publication. See, e.g., *Commissioner of Mental Health & Addiction Services* v. *Freedom of Information Commission*, 347 Conn. 675, 693, 299 A.3d 197 (2023).

Likewise, the associations suggest that a decision to include exclusively online newspapers as part of the substantial circulation inquiry should consider whether such publications have "a searchable archive, push notification signups, and how easy it is to navigate to the notice." Because this case does not involve an exclusively online newspaper but, instead, a newspaper that has both print distribution and an online presence, we need not consider whether to adopt these specific factors as a matter of construing § 8-3 (d), or even whether an online only news publication is a "newspaper" within the meaning of the statute. See L. Rieders, supra, 38 Hofstra L. Rev. 1035–37 (urging governments to permit legal notices to be published in online newspapers and describing statutory language in certain jurisdictions that may preclude such publication in absence of statutory change).

[15] At oral argument before this court, counsel for the plaintiffs argued that there is no evidence that the Press covers local news in Fenwick. Nevertheless, the record does not indicate that the Press does *not* cover local news in Fenwick or Old Saybrook, the town in which Fenwick is located. To the extent that there is an evidentiary deficiency in this regard, it is suffered by the plaintiffs—who bear "the burden of proving that the notice requirements were not met." *Roncari Industries, Inc.* v. *Planning & Zoning Commission*, supra, 281 Conn. 77; see, e.g., *Fisette* v. *DiPietro*, supra, 28 Conn. App. 384–85. Moreover, counsel for the commission represented—without objection by the plaintiffs' counsel—that he was not aware of any other daily newspapers published in the Middlesex County region that include Old Saybrook and Fenwick. We note, however, that there is no affidavit or other evidence in the record to establish this fact.

9 Pettipaug, LLC *v.* Planning & Zoning Commission

of the Press for notice by publication should be of no surprise within the boundaries of Fenwick, further warranting deference to the commission's decision to publish notice in the Press.[16] See *Higley* v. *Bunce,* supra, 10 Conn. 442–43. Accordingly, we conclude that the Press is "a newspaper having a substantial circulation" in Fenwick within the contemplation of § 8-3 (d).

As the commission argues, its compliance with the publication requirement of § 8-3 (d) requires dismissal

---

[16] The parties present differing views on the effect of Fenwick's extremely small size relative to other municipalities with respect to the substantial circulation analysis. For example, the commission posits that the Appellate Court's emphasis on the lack of subscribers is "even more absurd" when considered in the context of Fenwick's "very small" size, with only fourteen year-round households and a substantial seasonal population. For their part, the plaintiffs argue that Fenwick's "highly unusual characteristics . . . [as] a tiny, mostly seasonal community that is wholly residential and insists on being independent of the town of Old Saybrook" render this case a poor vehicle for significant changes to the law governing notice publication. They argue that difficulties in compliance cannot "absolve" the commission of its obligation to "[comply] with the plain language of the statute," with those difficulties being the result of Fenwick residents' choice "to have their own municipal government." The plaintiffs counter the commission's reliance on "difficulty in obtaining subscriber numbers" as "ignor[ing] potential other options that it could use to ensure its decisions are published in a newspaper with a substantial circulation in Fenwick." Indeed, the plaintiffs rely on evidence that, in contrast to the Press, Fenwick residents subscribe to other local publications, namely, The Hartford Courant and a free newspaper published by Shore Publishing, LLC.

Given the ubiquity of the statutory language at issue in this appeal; see footnotes 7 and 11 of this opinion; we agree with the plaintiffs that this case requires us to construe § 8-3 (d) in a way that is flexible and as workable in a very small, largely seasonal community like Fenwick as it is in Bridgeport, Hartford, New Haven, New London, or Stamford. Evidence that Fenwick residents actually subscribe to other publications does not defeat the ability of the Press to qualify as a newspaper of substantial circulation, as there is nothing in the statute that limits that term to a single publication. See *Jarvis Acres, Inc.* v. *Zoning Commission,* supra, 163 Conn. 48. Finally, to the extent that the plaintiffs contend that Fenwick's small size affords it "options . . . not available to larger municipalities," such as publishing its own newsletter and distributing it to each household, or surveying its residents periodically to determine which newspapers they read online or in print, we observe that these solutions call for a measurement of actual notice to Fenwick residents, rather than the fair and sufficient notice required by the statutory scheme, which is constructive in nature.

of the plaintiffs' zoning appeal, which was untimely because it was commenced on October 25, 2019, more than fifteen days from the date that notice of the decision was published, without the benefit of the savings provision of § 8-8 (r). See, e.g., *Bridgeport Bowl-O-Rama, Inc.* v. *Zoning Board of Appeals*, 195 Conn. 276, 283, 487 A.2d 559 (1985); *Reardon* v. *Zoning Board of Appeals*, 311 Conn. 356, 366–68, 87 A.3d 1070 (2014). The Appellate Court, therefore, improperly affirmed the judgment of the trial court to the contrary.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to reverse the judgment of the trial court and to remand the case to that court with direction to dismiss the plaintiffs' zoning appeal.

In this opinion the other justices concurred.